No. 35.—LEONARD C. HUFF and WILLIAM CHAMBERS, plaintiffs in error vs. CHARLES J. McDONALD, and others, defendants in error.

[1.] If one tenant in common, receive more than his just share, he is liable to account to his co-tenant for such surplus, and for all the profits which he makes out of such surplus; and if there is proof that he used such surplus, and no proof as to whether he made any profits out of it or not, the presumption is, that he made profits out of it, and profits at least equal to the interest on the value of such surplus calculated at the legal rate.

[2.] If one tenant in common, receive more than his just share, the statute of limitations does not commence running in his favor, so as to bar an action of account by the co-tenant, until the tenant begins to hold such surplus adversely to the co-tenant, and knowledge of that fact comes to the co-tenant.

In Equity, from Cass Superior Court. Tried before Judge BROWN, at September Term, 1856.

The bill alleges that complainant, Charles J. McDonald, on the 2d of May, 1843, purchased at a sale made by the

Commissioner in Bankruptcy for the State of Georgia, the *one undivided quarter* of the south-east half of lot No. 210, in the 2d district of Carroll county, sold as the property of John T. Rowland, a bankrupt. That sometime in the year 1843, he purchased one other undivided fourth part of said south-east half of said lot, from one Littleton Atkinson, but the deed of conveyance from Atkinson to complainant was not executed and delivered until the 8th of October, 1844, at which time he also conveyed and assigned to complainant, all his right, title and interest to all damages for trespasses in digging gold on said lot.

The bill further alleges that in the year 1842, the defendants Huff and Chambers, entered upon said premises, which contained a valuable gold, mine, and engaged extensively in working the same, and continued for sometime their mining operations thereon, and dug up and appropriated to their own use, gold amounting to a very large sum; that they also leased or rented to others the right and privilege of mining on said premises, and received large sums as rent for said right and privilege thus to dig gold; that defendants refuse to account with and pay to complainant the share which is due and coming to him from said mining operations and from said rents as joint owner or tenant in common of said premises; that he has no means of proving the amount of gold dug, the number of hands engaged, and the expenses of the mining operations, except by resorting to the consciences of the defendants. The bill prays for a discovery and account; that the books kept of their transactions may be produced; and that said defendants or either of them, be decreed to pay over to complainant the share or amount found due to him from them or either of them upon such accounting, &c.

The defendants demurred to the bill, for want of equity, and because complainant had adequate remedy at law for the trespasses complained of; and because no assignment of damages for trespasses committed before complainant pur-

chased from Atkinson, could give him a right to a recovery, on account of said trespasses ; which demurrer was overruled by the Court, and defendants excepted.

And answering, they admit that they entered upon said premises about the 1st Aug., 1842, and continued thereon until about the 25th Dec., 1843, and did work the mines thereon, and dig up and carry away and appropriate to their own use all the gold found, and they deny complainant's right to any share of the same or to have any account therefor from them; they say that Chambers purchased from one William A. Maxwell, one *fourth-part* of said south half of said lot, in the year 1842, and obtained from him a bond for titles to the other fourth part of said premises, said bond made by one Benjamin Chapman, but was not assigned in writing to defendant, and under this purchase they entered upon said lot, and engaged in the business of digging gold thereon. They knew that there was other just owners or tenants in common, but they were wholly ignorant of any title or interest of complainant in said premises, and were informed that it was the agreement or understanding of all the owners, that any one could enter upon and dig for gold without liability to the others for rents or otherwise, and with this information and under this belief, they entered upon said lot and commenced digging, and they did rent to others the privilege of digging. But they deny that they ever obtained a hundred thousand dollars worth of gold, as charged in complainant's bill, or any thing like this amount; or two thousand dollars for rent, but they affirm, that after working on said premises until about the 25th of December, 1843, they came to a settlement, and the amount of gold they made on said south half of said lot, after paying and deducting therefrom all the necessary expenses, was about three hundred dollars, and this—without allowing defendant Chambers anything for his services in superintending the business, and if a reasonable sum should be allowed for those services, nothing was made. They are unable to state how much gold was dug, or the

number of hands they had employed—from whom the ne-
groes were all hired; the prices paid was about ten dollars
per month. The books, in which was kept the names of the
hands hired, the prices paid and the amount of gold dug, up
to the time they quit their operations and made their settle-
ment, has been lost or mislaid, and this was occasioned by
the removal of defendants to places distant from their min-
ing operations. They do not admit the tenancy in common
with them of complainant—deny his right to receive any
part of the gold dug by them, and hold him to a strict proof
of his title, &c.

The case coming on to be heard, after the reading of the
bill, answer and replication, the complainant offered in
evidence,

1st. A grant from the State of Georgia to John Martin, for
lot of land No. 210, in the 2d district of Carroll county, dated
17th June, 1830. Then a deed from John Martin to Willis
Rabun for the same lot, dated 5th August, 1830. Then a
deed from Willis Rabun to John T. Rowland and Littleton
Atkinson to south-east half of said lot, dated 28th December,
1838, a deed from Atkinson to Charles J. McDonald to the
one undivided fourth part of the said south-east half of said
lot, dated the 8th October, 1844, and recorded the 6th April,
1847; also a deed from M. Myres, general or official assignee
in bankruptcy for the district of Georgia, to Charles J.
McDonald, for the undivided one quarter of the south-east
half of the same lot, No. 210, sold as the property of John T.
Rowland, dated 2d May, 1843. To the introduction of this
last deed, counsel for defendants objected, on the ground
that no judgment, order or decree authorizing, said sale, had
been shown or produced. The Court overruled the objec-
tion, and defendant's counsel excepted.

2d. Complainant then offered in evidence the following
instrument of writing, viz:

"For value received and in consideration of the sum of
three hundred dollars to me in hand paid, the receipt where-

of is hereby acknowledged, I, Littleton Atkinson, of the county of Macon and State of Georgia, have bargained, sold, and assigned, and by these presents do bargain, sell and assign to Charles J. McDonald, of the county of Cobb, and said State, all my right, title and interest, both at law and in equity, to damages for trespasses in digging gold on lots of land Nos. 209, 210 and 205, all in the second district of the county of Carroll, with full authority to use my name in the recovery thereof.

In witness whereof I have hereunto set my hand and seal, this eighth day of October, A. D. 1844.

L. ATKINSON, [L. S.]

JAMES L. GREEN, J. P.

Counsel for defendants objected to the introduction of this paper, on the ground that it only authorized complainant to use the name of Atkinson, and he could maintain no action on it in his own name, and the right to bring suit for a trespass not being assignable, the same was void, which objections were overruled by the Court and the paper admitted and allowed to go to the jury.

3d. Complainant then submitted the following depositions of witnesses examined by commission,

*Solomon Morrison.*—To the first interrogatory he answers, I know the parties.

To the second interrogatory he answers. I did superintend the digging for gold, for the defendants Huff and Chambers, on the south-east half of lot of land, No. 210, in the 2d district of the county of Carroll, from some time late in the spring of the year 1843, till Christmas thereafter, and from the 1st of January, 1844, as well as I can recollect, the whole year, and from the 1st of January 1845 until some time in May of the same year. I suppose the average of hands was about 20, rather more than less than that number, they were principally blacks. I superintended about two years on said part of said lot; I suppose the average work of the hands was about a pennyweight to the hand per

day during the time of my superintending, and was delivered over to both the defendants and to a Mr. Jarnagin, agent for defendants.

To the third interrogatory, he answers: The defendants did lease out parts of said lot to other persons, Parker Rice, George Bivins, William Bivins and old man Bivins, whose given name I do not remember, and to a Mr. Pettis, whose given name I do not recollect; Rolen Talbot and his son William Talbot, and a great many others I cannot recollect. I think they paid the eighth of what they dug up, to defendants, and they did reserve the best digging ground for themselves. I would further state that a man by the name of Garrison, worked also on said lot, with black hands; there were always hands at work on said lot, besides defendants' hands.

To the fourth interrogatory, he answers: I worked the two first years, 1843 and 1844, for both defendants, and the year 1845 for L. C. Huff, as I think defendants dissolved copartnership on the 25th of December, 1844. The work, as before stated, was a pennyweight to the hand, which was paid over to defendants during their partnership, after which it was paid over to L. C. Huff.

To the fifth interrogatory, he answers: I do not know of anything more that would benefit the complainant.

*Cross Examined.*—First interrogatory, he answers: I have stated nothing from heresay or belief—nothing but what comes from my own knowledge and recollection.

Second interrogatory, he answers: The hands were removed from this lot in 1844, thinking we could do better on another lot, but finding that we could not, we returned on the said lot, 210; while I was absent from this lot, Mr. Huff rented it to Mr. Rice, who made money. When I returned, Mr. Rice left the place; I commenced work again on the same streak, and made money and good wages, and Rice still worked on the same lot.

Third interrogatory, he answers: I think my opportunity

for knowing how much was made was near about as good as defendants, and would as soon trust to my recollection as their oath.

Fourth interrogatory, he answers: Some days we made over wages, others not so much, but as I have before stated, I think the average was over a pennyweight per day to the hand; that a person accustomed to mining could tell pretty much what was made.

Fifth interrogatory, he answers: We worked on a rock for a month, and I think, made expences. I left them while they were at work on the rock.

Sixth interrogatory, he answers: Huff & Chambers ditched the land to work themselves, and when they quit other hands worked more or less in the same ditches.

Seventh interrogatory, he answers: I know of nothing more that will benefit the defendants, nor nothing to prove what they have sworn to be true or untrue, as I do not know what they did swear.

*Thomas M. Tolbert.*—To first interrogatory, he answers: He knows the parties.

To second interrogatory he answers: That he has dug for gold on the south-east half of said lot of land, No. 210 in the second district of Carroll county, Georgia, and witness does not recollect in what year he worked on said lot, but he worked there the same time and with the same hands that were in the employment of Mr. Huff the defendant, and that he, witness, was also in the employment of Huff, and worked there in said employment two weeks or longer, upon the south-east half of said lot of land, in the second district of Carroll county. William Chambers, one of the defendants, was, witness thinks, concerned with said Huff, and was frequently there giving directions, and that, when witness dug for gold on the south-east half thereof, he made from three quarters to a pennyweight per day, and the ground worked by Huff and Chambers was better than the ground worked by witness; that he, witness, often heard Solomon Morrison,

the boss or superintendant of the hands of Huff and Chambers, say that they made from a pennyweight and a half per day, to two pennyweights per day to each hand, and that the ground witness worked was refuse ground, that they, the defendants, would not work, and that the hands superintended by Morrison were working on the south-east half of said lot of land, when he, witness, heard Morrison say as above stated. Parker Rice, James D. Powell and another man by the name of Bivins, worked there at the same time, and worked for a long time on their own hook.

To the third interrogatory, he answers: That he does not now recollect of hearing Huff say how much he made to the hand per day, for Huff, witness thinks, wished that kept a secret. Witness' brother, Richard Tolbert, was at the same time in the employment of Huff and Holland working on another lot near by, and the hands overseed by said Richard Tolbert, returned the gold dug by them every Saturday night to Huff, and witness heard his brother, the said Richard say, that Morrison and the hands under Morrison were doing about as well as he and those under him, and that he was making upon an average, from one pennyweight and a half to two pennyweights per day to the hand. Witness knows nothing more that would benefit the parties.

*William Gilbert.*—To the first interrogatory, he answers: That he knows Charles J. McDonald and Leonard C. Huff, but does not know William Chambers.

To the second interrogatory he answers: That he himself did not lease the privilege of digging for gold on the southeast half of lot No. 210, in the second district of Carroll county, from the defendants, but that he worked with George Bivins on the south-east half of said lot No. 210 in the second district of Carroll county in the year 1845; and understood that said Bivins had leased the privilege of digging for gold, from A. M. Stokely, and the rent money was paid or the gold that was dug was sold to Stokely. I cannot now say precisely the amount of gold we made per day, but think

it would have averaged a pennyweight per hand per day; worked five hands.

To the third interrogatory he answers: The defendant, Leonard Huff, was digging for gold on the same lot of land at the same time, and the ground on which Huff was digging, was said to be much better for gold than where we were digging; I saw them rocking down one or two evenings, but could only guess at the amount that was made per hand for that day, it appeared that they were making good wages, and I should suppose that they made from from 40 to 50 pennyweights on that day to that rocker.

To the fourth interrogatory he answers: That all he does known more than he has already stated is, that that part of the lot where Huff was digging, was considered first rate mining ground, so much so that said Huff would not give any one a lease to dig for gold on the branch or in the bottom. And further this deponent saith not.

*Zachariah A. Rice.*—To the first interrogatory he answers: He knows the parties.

To the second interrogatory he answers: That he did operate for gold on what was then called the Maxwell lot. It is situated about one mile and a half from Villa Rica, and in the county of Carroll; does not know the number of the lot or district; cannot say what part of the lot it was he operated on, it was near the junction of the branches, one of which runs through the lot; cannot say whether the other does or not. This was in the early part of the year 1844; worked about four months; his hands averaged about one-dollar per day; and paid toll to Leonard C. Huff; paid one eighth for toll; he says he worked in company with Mac Hensly; they worked eleven hands during that time.

To the third interrogatory he answers: That some places on said lot was richer than others, and the best work he did was five dollars to the hand per day, for a few days only.

To the fourth interrogatory he answers: That Leonard C. Huff commenced operating for gold near to where he was

working, about the time he quit; cannot say whether it was on the same lot or not, nor does not know how long the defendant Huff operated; cannot say what was the quality of the ground upon which the said Huff operated, but supposed it to be as good as that worked by himself. Huff commenced work, to the best of his recollection, in May, 1844; the length of time he worked, he cannot say; he worked some fifteen or twenty hands and superintended by Morrison; thinks his name was Sol. Morrison.

To the the fifth interrogatory he answers: That the value of the tools necessary for digging gold, would be about five dollars per hand per year; knows nothing more.

*Nicholas F. Chambers.*—To the first interrogatory he answers: I do.

To the second interrogatory he answers: I dug gold on a lot called No. 210, in the second district of Carroll county, and I think, on the south-east half of said lot, and in and during the years 1845 and 1846; I cannot be positive about the amount, but can safely say, I dug between nineteen hundred and two thousand pennyweights during the time mentioned. The rent to be paid was one-eighth, one-fourth of which I retained as joint owner of the lot, one-fourth of which I paid to Morrison and Williams, and promised to pay the remaining half to Leonard C. Huff.

To the third interrogatory he answers: I know of nothing more that can benefit the complainants.

*Cross Examined.*—To the first interrogatory he answers: I have no means of knowing the amount of clear profits made by defendants while working said lot; I would feel bound to believe the defendants on their oaths, never having had any reason to believe otherwise. I never paid any rent or promised to pay any to William Chambers for that lot; knows nothing about their clear profits.

To the second interrogatory he answers: I know nothing more that could benefit the defendants.

*A. H. Harrison.*—To the first interrogatory he answers: I do.

To the second interrogatory he answers: To the best of my recollection, they were in partnership in gold digging in the year 1842; I cannot recollect the exact time when they dissolved partnership, I think they were, to the best of my recollection and belief, they were engaged in work on lots of land Nos. 208, 209 and 210, in the second district of Carroll county.

To the third interrogatory he answers: They had a settlement of their gold digging operations, I do not know, but my impression is, that they had a settlement which embraced their whold business; cannot recollect the exact time the settlement was made.

To the fourth interrogatory he answers: He knows nothing more.

*Cross Examined.*—To first interrogatory he answers: My recollection is that they had dissolved previous to the settlement; we made the settlement from the entries made in their books, and from what Huff and Chambers said at time of settlement to the best of my recollection, the amount was three hundred and one dollars.

The second interrogatory : Is it not frequently the case in the Carroll mines, that hands make, some days four or five times as much as others, and do not companies of hands frequently fail to make expences, and sometimes not one-half or one-fourth of their expences, including hire and everything else.

To second interrogatory he answers: It is frequently the case that they do, and it is also frequently the case that they do not make one-half or one-fourth of their expences including everything.

To third interrogatory he answers: I know nothing more

*E. W. Holland.*—To first interrogatory he answers: He knows the parties.

To second interrogatory he answers : That the defendants

Huff and Chambers were engaged in digging gold in copartnership, from the fall of 1842 to the spring of 1844, on lots Nos. 208, and 210, in the second district of Carroll county.

To third interrogatory he answers: That in the spring of 1844, after Huff and Chambers had dissolved copartnership, he, in connection with Mr. Harrison, was called upon to arbitrate and settle some business between the defendants, and among other matters was to settle the amounts between the parties in reference to their gold operations upon the Nos. before named, 208 and 210, and after deducting expences for their operations on No. 210, there was a profit of about one hundred dollars, but this profit was more than consumed in employing a suitable person to superintend the work on lot No. 208—this was profits made.

To fourth interrogatory he answers: He knows nothing more that would benefit plaintiff.

*Cross Examined.*—To first interrogatory he answers: The settlement made between the defendants was made after they dissolved, which was in the spring of 1844.

To second interrogatory he answers: That in operations in the Carroll mines, it would require a hand to make from three-quarters to one pennyweight per day per hand to pay all expences.

To third interrogatory he anwers: A hand making only from three-quarters to one pennyweight per day, would make nothing clear after paying all necessary expences.

To fourth interrogatory he answers: That twenty dollars a month will not more than pay the expences of a hand in digging gold, when he is furnished with tools, clothing and subsistence per month.

To fifth interrogatory he answers: That Huff and Chambers made money in their gold digging operations on lot No. 208 before named, but they only made about one hundred dollars clear money out of their operation upon lot No. 210 before named. Huff and Chambers being both interested in their gold operations upon both the lots, Nos. 208 and 210,

one superintended the hands upon one of the lots and the other upon the other lot ; in the settlement thus made, neither charged anything for their own services ; if any charge had been made for superintending the hands upon lot No. 210, nothing would have been realized as a profit ; companies digging gold frequently fail to make anything by the operation.

*Isaac E. Bartlett.*—To first interrogatory he answers : That he does.

To second interrogatory he answers : During the year 1843 the amount of gold dug by Solomon Morrison, as overseer for Huff and Chambers, was :

|  | Dwts. | Grs. |
|---|---|---|
| To Leonard C. Huff, | 7312 | 17 |
| To Wm. Chambers, | 96 | |
| Paid in Charleston for goods bought for Huff and Chambers, | 149 | |
|  | 7557 | 17 |

To third interrogatory he answers : There were a good many lessees working on said lot, but that without reference to the books, he cannot state what amounts were dug and returned.

*Cross Examined.*—To first interrogatory he answers : That he does not know that he has ever seen the corners or stations of said lot, and only knows the lot from having heard Huff, Chambers and others say it was lot No. 210 of the second district of Carroll.

To second interrogatory he answers : He knows nothing further.

*Re-Examined.*—To the second interrogatory he answers : That he has the original statement referred to in said interrogatories, and which original statement is hereto annexed, and to the best of his recollection it was made in the early part of the year 1844. It is a true statement and was made from the books kept by him for Huff and Chambers, and was at the request of Leonard C. Huff.

To third interrogatory he answers : That he knows nothing more that will benefit the plaintiff.

Amount of gold dug by Solomon Morrison, for Huff and Chambers, on lot No. 210, year 1843.

|  | Dwts. | Grs. |
|---|---|---|
| Amount received by L. C. Huff, | 7312 | 17 |
| "    "    " Wm. Chambers, | 96 | 00 |
| "    paid for goods bought in Charleston, | 149 | |
| | 7557 | 17 |

*Cross Examined.*—To first interrogatory : That he knows that the gold mentioned in said memorandum was taken from the south-east part of lot No. 210 ; he knows it from his own knowledge of said lot, and what he has heard the defendants say; he cannot say, particularly, whether said defendants worked on both halves of said lot; but he is inclined to think they did work some on the other half of said lot.

To second interrogatory he answers: That there is no mistake in the number of the lot, it was No. 210, as mentioned in said memorandum; he made the memorandum at the request of Leonard C. Huff, to show the amount of gold dug on the south-east half of said lot, by Huff and Chambers in the year 1843 ; said memorandum was made, to the best of his recollection, in the early part of the year 1844.

*Edwin Noland.*—To first interrogatory he answers: I know the defendants. I do not know the plaintiff.

To second interrogatory he answers : I was employed by, and worked for, Huff and Chambers, the defendants, some time during the year 1843 or 1844, digging for gold on the south-east half of land No. 210, according to the information I have had concerning the lines of said lot ; my wages were the usual wages paid to hands at that time; say fourteen or fifteen dollars a month, hands finding themselves. The number of hands employed varied, some times fifteen or twenty, and at others, twenty-five or thirty ; I do not know how long defendants worked on said lot; I worked there in

their employ three or four months; I do not know the amount of wages paid by the defendants; the common hire of a hand, I have already stated, was fourteen or fifteen dollars a month.

To third interrogatory he answers: I do not know any thing of the amount dug by the defendants, it not having been made my duty to keep any account; I have no means, nor ever had any, of ascertaining it, or any average of any amount dug; nor can I say what was the average per hand of the hands employed.

To fourth interrogatory he answers: I worked some time in 1845, on said lot, in company with one Solomon Morrison, with a small force of four or five hands, and not exceeding a month in time, during which I remember our average was not more than half a pennyweight to the hand, about half this time the work alone was done on the north-west half of said lot: our lease being on the dividing line, according to my understanding; to the best of my recollection, we paid the one-eighth of the amount dug, for the privilege of mining; I have no means of ascertaining or refreshing my memory as to the amount dug or the amount of rent paid by us. I worked some time in 1848, in copartnership with my brothers William, Seaborn and Samuel Noland, under a lease from Leonard C. Huff, paying the eighth toll to Messrs. Merrell C. and William H. Arotey, as agents for said Huff. I am now working on said lot, in copartnership with my brothers Samuel and Seaborn Noland, under a lease from Leonard C. Huff, on the south-east half of said lot, paying the tenth for rent, but I cannot recollect how long I have been working. I have paid the toll weekly, semi-monthly, or monthly, to Mr. Abel H. Harrison, as Mr. Huff's agent, as my necessities or inclinations prompted me.

To fifth interrogatory he answers: I have already stated all I know or can remember about the matter in question.

*Cross Examined.*—To first interrogatory he answers: There was certainly more gold dug some days than others.

The other part of this interrogatory I have already answered in my answers to the direct interrogatories.

To second interrogatory he answers: I have not the least idea.

*George Noland.*—To first interrogatory he answers: I know the defendants, but have no acquaintance with the plaintiff.

• To second interrogatory he answers: I was in the employ of the defendants Messrs. Huff and Chambers, in and during the year 1843, two or three weeks of which time I worked on the south-east half of lot of land No. 210 in the second district of Carroll county; my wages were fifteen dollars a month, and find myself, that being the common price for hands at that time; I have no recollection of the number of hands at work on the lot, for Messrs. Huff and Chambers; nor how long they worked; the customary price for hands was fifteen dollars a month, hands finding themselves.

To third interrogatory he answers: During the time I was at work on said lot, the company with which I was working generally made or averaged about a pennyweight a day to the hand; I know nothing of the amount dug or the average product made by all the hands employed, and I do not know the number of hands at work at that time, or at any other time.

To fourth interrogatory he answers: I never have at any time worked on said lot on my own account, nor for any other person, except the time specified above.

To fifth interrogatory he answers: I have already stated all I know about the matter in the foregoing answer.

*Cross Examined.*—To first interrogatory he answers: I believe we made a little more than we did at other times, and sometimes we did not make quite as much as we did at other times, and sometimes neither one nor the other, much or little, but sorter betwixt and between, but no two days exactly alike, that I can remember; the first part of this interrogatory I have already answered in my answer to the direct interrogatories.

Second interrogatory : Do you know how much gold defendants made on said lot ?

To second interrogatory he answers : I do not.

*James D. Powell.*—To first interrogatory he answers : That he has been acquainted with the parties.

To second interrogatory he answers : That he did operate for gold on the south-east half of a certain lot of land in the second district of Carroll county : but cannot speak particularly as to the number of the lot. As well as witness recollects, a man named Roberts had a farm lying on the north side of the lot that he operated on ; and a man named Jarnagan owned land on the west, and John R. Wick owned land, as witness understood, on the south side of said lot ; Solomon Morrison was superintending Leonard C. Huff's hands that were operating on another part of the south half of the same lot, the same year; it was in 1844 that witness and the company witness was operating with, were at work on said lot for gold. William Chambers had been operating on the same lot the year before; at the time that witness and those working with him were working on the south-east half of said lot, namely, in the year 1844 ; Leonard C. Huff was operating on the same half of said lot, that witness and witnesses' company operated on—that is, on the south-east half of said lot. Witness does not know whether William Chambers was concerned with Leonard C. Huff or not; the work was called Huff's work. Leonard C. Huff operated with about ten or fifteen hands, superintended by Morrison, at the time witness and his company were operating on the south-east half of the above mentioned lot of land. He was operating under a lease from Leonard C. Huff, but witness understood at that time, or has understood since, that the plaintiff had an interest in said lot.

To third interrogatory he answers : That he cannot answer exactly, what amount of gold he and his company made per day to the hand, while operating on said lot ; some days they would not make a quarter of a dollar to the hand, and

some other days they would make a dollar a day or over; one day we made five dollars. He, witness, remembers that his company consisted of twelve hands, and at the end of the month, when they came to sell the gold, they had made a little over four hundred dollars worth of gold, but that was the best month's work they did on an average of all the time witness worked on said lot. Witness supposes that his company made ninety-five cents to the hand. Leonard C. Huff worked some ten or fifteen hands; witness does not know of any other hands that were worked on that half of said lot by Leonard C. Huff, except those superintended by Solomon Morrison; there were other persons operating on that half of said lot in 1844, under leases from Leonard C. Huff; as well as he can recollect, Garrison and Moody worked a while on said lot. Anderson Hensley also carried on some work on that part of said lot; Nathan Camp also worked some on that half of said lot, in the year 1844.

To fourth interrogatory he answers: That Leonard C. Huff worked the best ground on said half lot, and his hands did better than we did, but witness cant tell how much they made to the hand.

To fifth interrogatory he answers: That he knows nothing more in favor of the plaintiff.

*Solomon Morrison.*—To first interrogatory he answers: I do.

To second interrogatory he answers: That the gold was dug from the part of the lot No. 210 in the second district of Carroll county, which lies south-east of Sweetwater Creek, where it makes a sudden bend to the north or north-east; and the north-west half of said lot, was dug by Jesse Wooton and Jonathan Davis, and others, under a purchase or lease from Jesse Roberts or his father.

To third interrogatory he answers: That Sweetwater creek runs through lot No. 210 of Carroll, and a small creek or branch comes in from lots Nos. 206 and 207, which is

Huff & Chambers vs. McDonald et al.

known as the Pine Mountain branch, as near as he can describe it, agreeably to the annexed diagram:

No. 239.    North.    No. 238.

East.

No. 209.

210

211

West.

No. 207.    South.    No. 206.

Sweetwater creek enters the north and south line, dividing lots Nos. 209 and 210, considerably north of the center of the lots, and that Sweetwater creek does not run into lot No. 211, it runs out of lot No. 210, nearly north, cutting through the corner of lot No. 239, and then takes a north-east course through lot No. 238.

To fourth interrogatory he answers: That he has this morning been on lot No. 210, and examined it, and he is satisfied that the answers to his first interrogatories, taken in this case, were correct, particularly in this point, that the work he done for Huff and Chambers on lot No. 210 was nearly all of it, or all of any importance, done on the south-east side of the lot, and on the south side of Sweetwater creek, he thinks he worked on said lot about two years with an average of twenty hands, and thinks he made an average of a pennyweight of gold to the hand per day, and that he did not know how the lot was divided, and from Mr. Huff's description of the ground, believes that the lot was equally divided from east to west, which would have thrown most of the work which he had done on the north side of the lot, and that when he answered the second set of interrogatories he had not been on the lot for some years, and his mind was bewildered by Mr. Huff's statements of the situation of the lot; that he did work for a short time, say a month or more, on the north side of Sweetwater creek, near the west line of

lot No. 210, on some ground then worked by Mr Jarnagin; all the balance of the work on the lot, for Huff and Chambers, was done on the south side of Sweetwater creek, and on that part of the lot conveyed by Willis Rabun to John T. Rowland and Littleton Atkinson, and there were at times, large numbers of hands working on said lot No. 210, under the authority of Huff and Chamber as lessors; he thinks the average number of lessees, on the lot for the year 1843 and 1844, of Huff and Chambers, was about twenty; at least the lessees all worked on the south side of Sweetwater creek, and that he knows nothing further that will benefit complainant.

It was admitted that gold taken in the Carroll mines, was worth a dollar a pennyweight, at the mines.

The complainant here closed his case.

The defendants then read in evidence, to the jury, the following testimony:

A deed from William A. Maxwell to William Chambers to the one-fourth of the undivided south half of said lot, dated 16th day of July, 1842, and the following answers to interrogatories:

*Solomon Morrison.*—To first interrogatory he answers: He commenced working and superintending hands for Leonard C. Huff, in the year 1840, and worked that year on what is called the hill lot, I believe 224, in the 6th and part of the Clopton lot; and 1841 on the same; in 1842 he worked up to August for said Huff on No. 209, in the second district of Carroll; and after the commencement of August, of that year, he commenced superintending the hands of Huff and Chambers, the defendants, on lot No. 210 in the second district of Carroll.

To third interrogatory he answers: He commenced superintending their hands on lot No. 210 in the second district of Carroll, he thinks in 1842, and continued to work on lot No. 210, he thinks, until September, 1843; I then went on

to another lot, called the black gravel lot, number not recollected, and worked on that lot until Christmas 1843, and then Huff and Chambers dissolved partnership, as he understood, and he superintended the partnership hands no longer; while I was overseeing their hands, they varied; at first there was not more than seven or eight, and it was increased so that the average number of hands, I suppose, was about twenty for all the time, it being sometimes more and sometimes less.

To fourth interrogatory he answers: He kept no account of the gold dug by defendant's hands during the time he superintended them.

To fifth interrogatory he answers: He knows nothing more in favor of defendants, only that he handed over the gold to the defendants and Mr. Bartlett, in a rough state, without being neatly cleaned; he worked on the north-west half of the lot, thinks he averaged a pennyweight or a pennyweight and a half to the hand.

*Cross Examined.*—To first interrogatory he answers: He thinks the defendants had some work done on the south-east half of said lot, before he was employed, he thinks only for a few days before he was employed.

To second interrogatory he answers: He does not know that Huff superintended any hands on said part of said lot; Huff and Chambers dug and had gold dug from that part of said lot; he does not know how much gold they dug from said part of said lot.

To third interrogatory he answers: There were at times, a large quantity of hands working on said lot, under the authority of the defendants; other times, there were but few, I suppose the average number of hands for the year 1842 and 1843 worked by them, besides what he worked, was something like twenty; commencing, he thinks, in August. 1842, and perhaps not more than an average of fifteen for about sixteen or seventeen months; from his knowledge of the ground, so far as he tested it, he found it poor; he would

suppose that the hands might average from one-half to three-fourths of a pennyweight per day on that part of the lot.

To fourth interrogatory he answers: That he gave his evidence before as to his opinion of the quantity of gold dug per hand on the part of the lot on which he worked to wit: he worked on the north-west half of said lot, and superintended the hands of Huff and Chambers.

To fifth interrogatory he answers : That he knows nothing more.

*Isaac E. Bartlett and Edmond W. Holland.*—To first interrogatory they both answer: We do.

To second interrogatory they both answer : That Isaac E. Bartlett kept the books of Huff and Chambers, when they were digging gold on the south-east part of lot No. 210 in the second district of Carroll county. Isaac E. Bartlett says that when Mr. Huff and Mr. Chambers tried to make a settlement about the gold digging, done by them on lot No. 210 in the second district of Carroll, Mr. Chambers was dissatisfied, as they had not made any money clear, and they referred their settlement to E. W. Holland and A. H. Harrison, who made the settlement between them. I do not know what was made clear of expences. E. W. Holland says that A. H. Harrison and himself examined the books kept by Isaac E. Bartlett for Huff and Chambers, and made a settlement for them, and deducted the expences from the amount of gold dug, and the rents collected from other persons who had been digging on said lot, it left the sum of three hundred and one dollars, not including the services of William Chambers who superintended the digging on said lot, whose services he thinks was worth three hundred dollars per annum ; and the reason the wages of William Chambers was not taken in the settlement was, that Mr. Huff was superintending the digging on another lot; and this made a set off of their own services : the settlement was made in January 1844; they had been digging on said lot more than one year ; he derived his information from the books, and he occasionally saw

them digging on said lot; he says there was no profits made after deducting Chambers' wages; he says his means of knowing, was derived from the books kept by Isaac E. Bartlett, and produced to A. H. Harrison and himself for making the settlement between Huff and Chambers, and from seeing them working on the above named lot.

To third interrogatory Isaac E. Bartlett answers: And says that Solomon Morrison never delivered to him any clear gold, but delivered it to him in the sand as it was taken from the pan, and that Morrison never weighed or returned any gold on the books kept by him for Huff and Chambers; they both answer and say that a person cannot tell with any degree of certainty about the amount of gold, unless it is clear and weighed.

To fourth interrogatory they answer: And say, they have answered this interrogatory in their answer to the second direct interrogatory.

To fifth interrogatory Isaac E. Bartlett says: That Huff and Chambers dug gold on the north-west part of said lot a part of the time that he kept their books, and that Solomon Morrison worked with them; the said part of the lot belonged to Mr. Jarnagin, and they paid rent to him; they both say they know of nothing more that would benefit the defendants.

*Cross Examined.*—To first interrogatory, Isaac E. Bartlett, answers: That the last time he recollects to have seen the books of Huff and Chambers, was in the year 1844, and at the store of Stokely and Bartlett, and in their presence: E. W. Holland says that he does not recollect to have seen the books of Huff and Chambers since A. H. Harrison and himself made a settlement between Huff and Chambers, in or about the month of January, 1844.

To second interrogatory, Isaac E. Bartlett answers: That he was in the employ of L. C. Huff and kept the books of Huff and Chambers, and had charge of the gold dug for them on the south-east part of lot No. 210, 2d district of Carroll, and

cleaned and weighed and entered the same on the books; the gold thus dug was delivered to him by Huff and Chambers, and Solomon Morrison; he did not visit the hands often, and he derived his information from being in Huff and Chambers' employ and attending to their gold. E. W. Holland says that, he got his information from the books kept by Isaac E. Barlett, produced to A. H. Harrison and himself, when they made the settlement between Huff and Chambers, and frequently then at work on the said lot.

To third interrogatory, E. W. Holland answers: That he was on said lot in 1843, and saw Huff and Chambers' hands digging, and saw E. M. Price's hands digging about the same time, and there is more land on the south-east side of said creek; he does not know whether said Huff dug the ground spoken of in the interrogatory or not; he does not know how many hands L. C. Huff worked on said lot.

To fourth interrogatory, they both answer: They have answered that in their former answers.

To fifth interrogatory, E. W. Holland says: That he does not recollect how many lots nor what lots were embraced in the settlement as they made the settlement from the books, as also the expence of digging that lot 210, in the 2d district of Carroll was embraced in said settlement.

To sixth interrogatory, Isaac E. Bartlett answers: That he weighed most of the gold dug by Huff and Chambers on said lot; and it was seldom if ever cleaned and weighed in the presence of the overseer or hands, and when the gold was cleaned and weighed, it was done correctly and entered on the book; E. W. Holland knows nothing of the weight of the gold.

To seventh interrogatory, Isaac E. Bartlett answers: That the memorandum attached to a former set of interrogatories is correct as to the amount of gold dug on lot No. 210, in the 2d district of Carroll, it is the amount dug on the whole lot; not what was dug on the south-east part, but on the whole lot by Huff and Chambers, more than half of the gold mention-

ed in said memorandum, was dug from the south-east part of said lot.

To eighth interrogatory they both answer: That they do not know of anything more that will make in favor of plaintiff.

*Isaac E. Bartlett.*—To the first interrogatory, he answers: That he knows the parties.

To second interrogatory, he answers: That he knows the precise number of pennyweights and grains from the books of the defendants kept by himself for said defendants.

To third interrogatory, he answers: That he knows the amount of gold dug as stated in a former set of interrogatories by the books of the defendants kept by himself, and that he knows the amount used by William Chambers to-wit: 96 dwts., and the amount paid for goods bought by Huff and Chambers in Charleston, to-wit: 149 dwts. from the entries in the books of the defendants kept by himself; he knows the gold dug was from lot No. 210, in the second district of Carroll county.

To fourth interrogatory, he answers: That Chambers superintended hands on lot No. 210, in the 2d district of Carroll county, and that Huff attended to hands on lot No. 208, in the 2d district of same county; they did not all work together, there was three companies employed by defendants; Huff, Chambers, and Solomon Morrison, attended these companies. He does not know who made the most gold, nor on what lot the most gold was made.

To fifth interrogatory, he answers: That he does not know what the plaintiff was doing; the defendants were selling goods, and also in buying and selling gold.

To sixth interrogatory, he answers: That he kept the books of Huff and Chambers, the amount of gold dug.

To seventh interrogatory, he answers: That he knows that Huff and Chambers made an effort to settle their partnership in the gold digging, he says he took the memorandum from the books at the request of Huff, which is attached to a for-

mer set of interrogatories. Huff and Chambers failed to settle, it was in the year 1844, at Villa Rica, in Carroll county, to the best of his recollection. E. W. Holland and A. H. Harrison were then called in to make the settlement. The book showing the amount of gold dug, was shown and presented to the parties that made the settlement.

To eighth interrogatory, he answers: That he cannot state the amount of gold dug on the south-east half of said lot.

To ninth interrogatory, he answers: That since his former set of interrogatories was taken, he recollects that said lot was divided by a line, and that Huff and Chambers dug gold on both halves of said lot. There was a creek running through said lot, and that the bed of the creek was the dividing line for a good portion of the way; he says that the most gold was dug on the south-east half, or he was so informed by Huff; after paying rent of the gold on the south-west half of said lot to Mr. Jarnagin, the balance was placed in with the gold of the defendants, and makes the sum total of the partnership gold. There was gold dug on the dividing line and on both sides of it.

To 11th interrogatory, he answers: That he knows nothing more.

*Cross Examined.*—To first interrogatory, he answers: That the defendants stated the number of the lot from which the gold was dug, and he has so stated in a former set of interrogatories.

To second interrogatory, he answers: That the creek runs east through two-thirds of said lot, and then runs north-east to the line; and he thinks it does not touch lot No. 211, then enters lot No. 239, where the creek makes the turn north-east the dividing line runs straight through to lot No. 211, which is a dry line from whence it leaves the creek.

To third interrogatory, he answers: That the settlement was made from the statement of the parties, and from the books of the parties kept by him as their clerk, and that he does not know where the books are.

To fourth interrogatory, he answers: That 'he does not know anything about Willis Rabun's having sold the southeast half of said lot.

To fifth interrogatory, he answers: That he was at the diggins on said lot, a portion of the time, and a very small portion of the time, at that, and that he knows the lines from the statement of Huff and Chambers and the others, that were interested in said lot, and that he has not seen the lines for a number of years, they were pointed out to him by defendants, Jarnagin, Roberts and others.

To sixth interrogatory, he answers: That he knows nothing more that will benefit the plaintiff.

*Edmund W. Holland.*—To first interrogatory, he answers: I do.

To second interrogatory, he answers: That he was present at a settlement with defendants; and himself and Abel H. Harrison made the settlement in the year 1844, and the profits of digging gold, not including Chambers' services, was three hundred and one dollars.

To third interrogatory, he answers: That Solomon Morrison was overseer of the hands of William Chambers; was principal boss, and he received the gold dug on south-east half of lot No. 210, from said Morrison; the services of William Chambers was worth about three hundred dollars a year.

To fourth interrogatory he answers: That the profits of digging was so small that the hands were withdrawn from said lot, and defendants dug no more on said south-east half of said lot No. 210, and that he knows nothing more that will benefit defendants.

*Cross Examined.*—To first interrogatory, he answers: The settlement was made in the year 1844, and was made from an exhibit of the books kept by said defendants of the several amounts of gold dug.

To second interrogatory, he answers: That he did not superintend at any time, but William Chambers was superintendant.

To third interrogatory he answers: That the price of hands was fourteen dollars a month, including board; the principal part of the hands was furnished by Leonard C. Huff and were mostly black hands.

To fourth interrogatory, he answers: That the digging was mostly on the east part of said half.

To fifth interrogatory, he answers: That neither of the defendants dug on said east half of said lot, but L. C. Huff dug afterwards on the north half of said lot, No. 210, belonging to said N. Jarnagin; both defendants moved off, and Stokely and Bartlett received rents under the direction of A. H. Harrison & Co. and the toll was one-eighth of the amount dug; what rents were received before the settlement was included in said settlement; as to who dug as renters on said lot, he does not know.

To sixth interrogatory, he answers: That he knows nothing more that will benefit the claimant.

The cause being closed, counsel for the defendants requested the Court to charge the jury.

1st. That if the plaintiff is entitled to recover anything, he is not entitled to interest.

2d. That the statute of limitations commence to run against the plaintiff whenever he could have instituted suit against the defendants, and that he could have sued the defendants when they quit their joint work, and if he failed to bring his suit within four years from the time they ceased their joint work on said lot, then his right to recover is barred and he can recover nothing.

3d. That the bill being filed against Huff and Chambers for joint work, and no charge being made in it against Huff alone, since he and Chambers ceased their joint operations on said lot, then plaintiff can recover nothing against Huff alone.

All of which, the Court refused to charge, and counsel

for the defendants excepted; and the Court charged the jury as follows:

1st. That if the complainant is entitled to recover anything, he is entitled to interest from the time when defendants converted the gold bullion into money, and thereby appropriated it to their own use.

2d. That the parties having, as the Court understood them, while conducting the evidence before the jury, admitted themselves to be tenants in common and the Court regarding them as such, the complainant's right of action did not accrue until defendants disavowed complainant's right and he had notice of that fact, and that the statute of limitations did not commence to run till complainant's right of action had accrued.

3d. That the bill being filed against the defendants jointly, and severally, complainant had a right to recover of them jointly for his proportion of the gold dug by them jointly from the part of the lot to which he has shown title, and of half separately for his proportion of the gold dug by them separately after deducting all expenses of procuring the gold in each case. And counsel for the defendants excepted.

The jury returned a verdict for the plaintiff for the sum of three thousand and thirty-five dollars and twelve cents, with costs of suit, against Huff and Chambers, and the sum of two hundred and seven dollars and seventeen cents, with cost of suit, against Huff.

And counsel for the defendants during the Term of said Court, moved for a new trial, on the following grounds, to-wit:

1st. Because the Court refused to charge the jury as requested by defendant's counsel.

2d. Because the Court overruled the demurrer to that part of the bill which seeks to recover damages for trespasses

committed on said lot of land, prior to complainant's purchase, and which were assigned to him by Atkinson.

3d. Because the Court allowed said assignment to be introduced as evidence, and to be read to the jury.

4th. Because the Court permitted the deed of conveyance from Myers the assignee in bankruptcy to be read in evidence to the jury, without any order, decree or judgment of the Court being produced or shown, authorizing the sale of the land conveyed by said deed.

5th. Because the verdict of the jury is against evidence, and the weight of evidence.

All of which grounds were overruled by the Court and a new trial refused.

And defendant's counsel excepted.

W. AKIN, for plaintiffs in error.

J. W. H. UNDERWOOD, for defendant in error.

*By the Court.*—BENNING, J. delivering the opinion.

The first two grounds of the demurrer were not insisted on.

The third, and only remaining ground, had been obviated by an amendment to the bill; an amendment by which the administrator of Atkinson had become a complainant in the bill.

The objection to the admission in evidence, of the assignment made by Atkinson, was also obviated by this same amendment.

The first question, therefore is, upon the refusal of the Court, to charge as requested.

The first request was this; "That if the plaintiff is entitled to recover anything, he is not entitled to recover interest." Was the Court's refusal of this request right?

The plaintiff and defendants were tenants in common; tenants in common of a piece of land containing a gold

mine. The defendants alone worked the mine. They received from it a quantity of gold. This gold they used, delivering no part of it to the plaintiffs.

By the 27th section of the Act of the 4th of Anne, "for the amendment of the law and the advancement of justice," it is amongst other things declared, that "actions of account may be brought" "by one joint tenant, and tenant in common, his executors and administrators, against the other, as bailiff, for receiving more than comes to his just share or proportion, and against the executor and administrator of such joint tenant, or tenant in common." *Schley's Dig.* 330.

If, therefore, one tenant in common, receives more than his just share, he is to hold the surplus above his share, *as bailiff*, for the other tenant in common, and is as bailiff to account for such surplus to that tenant. This seems to be the meaning of the statute.

Is a *bailiff* liable to the payment of interest?

"Bailiff or receiver to any man, &c. By this, &c., many things are implied, as that by bailiff is understood, a servant that hath administration and charge of lands, goods and chattels, to make the best benefit for the owner, against whom an action of account doth lie for the profits which he hath raised or made, or might, by his industry or care, have reasonably raised or made, his reasonable charges and expenses deducted." *Co. Litt.* 172, *a*

From this, it follows, that a bailiff is bound to pay his principal at least the *actual profits*, which he has made out out of the property which he holds as bailiff.

A tenant in common, who receives more than his share of the profits of the common property, holds the surplus as bailiff for his co-tenant, who, therefore, stands to him as his principal. He, consequently, is bound to pay his co-tenant the actual profits which he has made out of such surplus, as well as the surplus itself. *See Docker vs. Somes,* 2 *Myl. & K.*; 655, *Stor. Eq.* 465, 445.

Gold of the purity of that taken from this mine is, for all

practical purposes, equivalent to money. The gold, therefore, received by the tenants, Huff and Chambers, may be treated as so much money.

Now the law by saying that a particular rate of interest shall be paid for the use of money, says, in effect, that profits arise from the use of money, and that these profits are to be deemed equal, not only to the interest on the money at that rate, but to such interest plus another sum sufficient to pay the person using the money, for his risk, care, trouble and expense, in using the money.

The tenants, Huff and Chambers, had the use of the surplus gold, if any, which they received from the mine. They admit that they used all the gold which they received from the mine.

It follows, that it is necessary to presume, in the absence of proof to the contrary, that they made profits on this surplus gold, and that those profits were *at least* equal to what would have been the interest on that gold, considering the gold as so much money.

Now what they were bound to account for was, as we have seen, this surplus gold, and the actual profits which they made on it.

What the Court told the jury they were bound to account for, was, the sulpus gold and the *interest* on it. This was in effect, merely making interest on the gold the *measure* of the profits made on the gold.

Interest, as we have seen, is really in the eye of the law, an *inadequate* measure of the profits of gold or money.

What the Court told the jury therefore, was at least as favorable to them, that is, the tenants, Huff and Chambers, as they had any right to expect.

[1.] The effect of the charge being, then, merely that the jury might consider interest as the *measure* of profits, and the charge being made in a case in which, by the absence of all proof as to what were the actual profits, there was no

other measure of profits, the charge was free from error, at least, so far as Huff and Chambers were concerned.

It follows too, that if the requested charge had been given without explanation, it might have misled the jury. And therefore the Court was not bound to give it.

There is nothing in this conclusion adverse to anything contained in the 28th section of the Judiciary Act of 1799; a section which is as follows: "No verdict shall be received on any unliquidated demand where the jury have increased their verdict on account of interest, nor shall interest be given on any open account, in the nature of damages."

It was never supposed that there was anything in this section to prevent a *cestui que trust* from recovering from his trustee the *actual profits*, no odds how great, made by the trustee out of the trust property. Executors and administrators have had to account for the actual profits made by them out of the assets in their hands, be those profits as high as they might, just in the same way, and to the same extent, since the passage of the act containing this section as before its passage. And so it has been with all other like trustees. And a bailiff is, as we have seen, a servant or trustee like to these.

The next question relates to the statute of limitations and grows out of the charge on that subject refused, and the charge on that subject given.

At what time did the statute of limitations commence running against the plaintiffs?

The defendants Huff and Chambers, as we have seen, received and held the surplus gold as *bailiffs* for the plaintiffs; as bailiffs having the "administration and charge" of the gold for the "benefit" of the plaintiffs. In other words, the defendants were trustees of the gold for the plaintiffs; trustees entitled, at least, to the right, if not subject to the duty of administering, i. e. managing and using the gold for the benefit of the plaintiffs.

This being so, there was the same sort of relation between them and the plaintiffs, that there is between an executor and the legatees, an administrator and the next of kin, a guardian and the ward. But the relation between these is such, that it prevents the statute of limitations from running until the executor, the administrator, or the guardian, as the case may be, has begun to hold adversely to his correlative, and knowledge of that fact has come to the correlative.

[2.] It follows, that the relation between these plaintiffs of the one part and the defendants of the other, was such as to prevent the statute from beginning to run in favor of the latter against the former, until the latter began to hold the gold adversely to the former, and knowledge of that fact came to the former.

It is true, that in a case in the 4*th of Iredell's Eq. Rep.* 1, the Court comes to a different conclusion; but the Court cites no authority for its opinion, and besides, seems not to have adverted to this peculiarity of the relation which, under the statute of Anne, exists between the tenant in common, receiving more than his just share, and his co-tenant.

We think, then, that the Court below committed no error with regard to the statute of limitations.

The bill prays for an account against the defendants separately, as well as jointly.

The Court was right therefore, in refusing the third charge requested, and in giving the third charge given.

The evidence was conflicting; but we think, that there was at least as much in favor of the verdict, as against it.

The result is, that the exceptions must all be overruled, and the decisions excepted to, be affirmed.

Judgment affirmed