# June Term, 1897.

## WHEELING.

WILLIAMSON *et al. v.* JONES *et al.*

Submitted February 9, 1897—Decided June 11, 1897.

1  WASTE—*Oil—Trespass—Injunction.*
   Petroleum oil in place is part of the land. Its wrongful extraction by one lawfully in possession is waste, and by a stranger is trespass; in both cases irreparable injury, which may be enjoined. (p. 565.)

2. WASTE—*Remainder-Man—Tenant for Life.*
   It is waste in a tenant for life to take petroleum oil from the land, for which he is liable to the reversioner or remainder-man in fee. (p. 565.)

3. TENANT FOR LIFE—*Oil· Wells—Salt Wells—Mines.*
   A tenant for life may work open salt or oil wells or mines even to exhaustion, without account, but cannot open new ones. (p. 566.)

4. WASTE—*Tenant in Common—Liability of Co-Tenants.*
   It is waste in a tenant in common to take petroleum oil from the land, for which he is liable to his co-tenants to the extent of their right in the land. (p. 567.)

5. TENANT FOR LIFE—*Personalty—Ownership.*
   Things part of the land, wrongfully severed by a tenant for life, become personalty, but belong to the owner of the next vested estate of inheritance in reversion or the remainder, not the life tenant. (p. 569.)

6. EQUITY JURISDICTION — *Waste — Reversioner — Tenant for Life.*
   Where there is a life tenant, and timber or other thing part of the realty going to loss, and imperative need calls for it, equity may cause it to be cut or otherwise secured for the remainder-man or reversioner. Equity has power to do so, if it do no harm to the life tenant, or he be compensated. (p. 570.)

7. ESTOPPEL IN PAIS.
   Principles of estoppel *in pais* discussed. (p. 571.)

8. ESTOPPEL—*Title.*

If one claiming sole right to another's land spends money in improving or operating upon it, though ignorant of that other's right, the mere silence of that other will not estop him from asserting his title. He need not seek the other to tell him of his right, or speak at all, unless placed in such a situation as calls upon him to declare his right. (p. 574.)

9. JUDICIAL SALE—*Purchaser—Notice.*

A purchaser at a judicial sale is conclusively held as having notice of all facts touching the rights of others in the property sold, disclosed by the record of the case. (p. 574.)

10. SUITS TO SELL REALTY—*Parties.*

Owners of vested estates in reversion and remainder, whether by legal or equitable title, are indispensable parties to a chancery suit to sell the fee; and the presence as parties of a tenant for life, or of the trustee holding for them, does not make them parties by representation, and a sale under the decree will not affect or pass their right in the land. (p. 576.)

11. MARRIED WOMAN—*Estoppel in pais—Personal Estate.*

A married woman can not, by even fraudulent conduct, be barred under the principle of estoppel *in pais* from asserting her title to land, though separate estate; but as to her personal estate it is different. Now that she is enabled to contract as if single, she will be bound by estoppel *in pais* touching her contracts as if single. (p. 577.)

12. INFANTS—*Estoppel in pais—Fraud.*

An infant of years of discretion, by intentional fraudulent conduct, will be barred, under the doctrine of estoppel *in pais*, from asserting her title to either real or personal property against one misled thereby. (p. 579.)

13. WASTE—*Oil—Accounting.*

A tenant for life, or a tenant in common in sole possession claiming exclusive ownership, taking petroleum oil, and converting it to his exclusive use, is liable to account on the basis of rents and profits, not for annual rental. (p. 580.)

14. EQUITY JURISDICTION—*Injunction—Waste—Damages.*

A remainder-man or reversioner has jurisdiction in equity against a tenant for life to enjoin waste, and to have compensation for the damages, the same as if he sued at law, to avoid multiplicity of suits. The same is the case between tenants in common where one is guilty of waste. (p. 579.)

15. WASTE—*Payment of Proceeds—Interest.*

A tenant for life, who, by waste, has severed from the realty things that are part of it, as petroleum oil, has no right to have their proceeds invested so he may have interest therein

during the life estate, but their proceeds go at once to the owner of the next vested estate of inheritance. (p. 585.)

16. IMPROVEMENTS—*Allowance for Improvements.*
One making permanent improvements on land as if his own, at a time when there was reason to believe his title good, is to be allowed their value, so far as they enhance the value of the land; but if, when making them, he has notice, actual or constructive, of the superior right of another, he cannot be allowed them. (p. 588.)

17. TITLE—*Allowance for Improvements.*
One having notice of facts rendering his title inferior to another's, who, by mistake of law, regards his title good, can not claim for permanent improvements. (p. 590.)

18. OIL—*Waste—Set-Off—Rents and Profits.*
Under the circumstances, a party taking petroleum oil unlawfully is allowed all costs of production, including costs of boring productive wells, as a set-off against rents and profits. (p. 588.)

Appeal from Circuit Court, Tyler County.

Bill by Eliza Williamson and others against J. T. Jones and others. Decree for complainants, and defendant Jones appeals.

*Reversed.*

CALDWELL & CALDWELL, for appellant.

W. P. HUBBARD, THOS. L. STEATEY, H. P. CAMDEN, and GEO. E. BOYD, for appellees.

BRANNON, JUDGE:

I refer to the report of a former decision in this case for a full statement of the facts. 39 W. Va. 231 (19 S. E. 436). Under the judicial sale, Jones thought and claimed that he purchased the entirety of the two tracts,—one of one hundred and sixty-five acres, and the other forty-five poles; but, as seven undivided tenths vested by the will of David Hickman in Engle, as trustee, to hold for the use of his daughter Eliza Williamson for her life, with remainder to her sisters, and as the remainder-men were not parties to the suit, the decree of sale, and sale under it, were void and ineffectual to pass anything but the life estate in those seven-tenths; and so the remainder in them did not pass under the sale, but remained in the sisters of Eliza Williamson. Jones, however, took exclusive possession, claim-

ing the whole. He bored twenty-three wells in the pursuit and production of petroleum oil. The plaintiffs sued him in equity to enjoin his further production of oil, and for an account of what he had produced. After the decision upon a former appeal an account was taken, and the circuit court held that Jones pay the owners of the seven-tenths of the land for one-eighth of seven-tenths of the oil produced, and seven-tenths of the value of the timber taken from the land, thus charging Jones only for one-eighth of the oil, that being the usual rent, commonly called "royalty," in that section stipulated and paid to the land owner under oil leases. Jones appeals, and he assigns error in charging him with anything at all, and for other causes; and the plaintiffs cross assign error in charging Jones only with one-eighth, and for other causes.

We start with the fact that Jones was owner of three undivided tenths in fee in possession, and owner of a life estate for the life of Mrs. Williamson in the remaining seven-tenths, and the plaintiffs owners of the remainder in fee in those seven-tenths after the end of the life estate, a vested remainder; and, in this condition of right to the land, Jones bored twenty-three wells upon the land, and produced from May, 1892, to December 21, 1895, six hundred and twenty-two thousand, two hundred and eighty-one barrels of petroleum oil therefrom, valued at five hundred thousand, two hundred and ninety-eight dollars. Did he have right to bore for this oil? He claims that he had, and that every barrel of it is his, without liability to account to the plaintiffs; while the plaintiffs claim that he had no right to bore and produce this oil, but, having done so, he must account to them for full seven-tenths. Did Jones, as tenant for life, have right to extract this oil? He had not. Petroleum oil, in its place in the land, is a part of the land itself, just as are coal, timber, and iron. *Bettman* v. *Harness*, 42 W. Va. 433, (26 S. E. 271); *Williamson* v. *Jones*, 39 W. Va. 231, (19 S. E. 436.) A tenant for life cannot do anything entailing permanent injury to the estate of the remainder-man or reversioner. He cannot, therefore, dig for gravel, lime, clay, stone, or the like; cannot open new mines for minerals. 1 Lomax, Dig. 54. If he take clay to make brick, not for repair of buildings, but for sale, it is waste. *University* v. *Tucker*, 31 W. Va.

622, (8 S. E. 410). It is the duty of the life tenant to protect the land from waste or injury even from others, and he must abstain from so doing himself. 1 Washb. Real Prop. p. 116, § 24; 1 Lomax, Dig. 57. Therefore, when Jones himself committed waste by boring for oil, he was a wrongdoer, so far as concerns his life estate. The remainder-men could sue him in an action of waste, as at common law under the English statute of Malbridge, or in action of trespass on the case under chapter 92 of the Code, and recover the full value of their seven-tenths.

It is sought to show that Jones, as life tenant, had right to all the oil, by the case of *Koen* v. *Bartlett*, 41 W. Va. 559, (23 S. E. 664), but that case will not sustain this claim. It asserts only that a tenant for life may use the land and its profits, including mines of oil or gas open when his life estate begins, or lawfully opened and worked during its existence. There the owner in fee had made a lease for oil, with a royalty as rent, and then conveyed the fee, reserving a life estate, and it was held that he, as life tenant, was entitled, as against the remainder-man, to the royalty; but there the owner had authorized the boring for oil, and the conveyance was subject, in terms, to the lease, and, though the boring had not produced wells open at the commencement of the life estate, they were bored, under authority, during its continuance. We held that a mine bored in the period of the life estate, under prior authority, was to be deemed as if an open mine at the commencement of the life estate. It is established that an open mine may be worked to even exhaustion by the life tenant. *Crouch* v. *Puryear*, 1 Rand. (Va.) 258; 1 Lomax, Dig. 54. The offense of waste consists in the first penetration and opening of the soil, and it is not waste to dig in mines or pits already open, which have become part of the annual profit of the land. Tayl. Landl. & Ten. § 249a. When Jones penetrated the soil, he did so without warrant from his life tenancy, and without warrant from the creator of the life estate. There was no open well, no antecedent authority to bore one. *Koen* v. *Bartlett* is no help for him. It may occur that, if Jones could not, his life estate would be worthless to him. The oil might be drawn off by wells on an adjoining tract. As life tenant, he was entitled to none of it. Such is the quality of that estate.

Having seen that Jones, as life tenant, could not take this oil, we shall next inquire whether his right as owner in fee of three-tenths gave him right to do so. Jones was a tenant in common with the owners of the seven-tenths. By the old law one tenant in common was not liable to another for waste; but our Code of 1891 (chapter 92, § 2) has remedied this unreasonable rule by making tenants in common, joint tenants and parceners liable for waste. 1 Lomax, Dig. 499; 2 Minor, Inst. 620. Then we have simply to inquire whether the extraction of oil is waste, and under authorities above given we must answer that it is. Those acts which would be waste in a tenant for life would be between tenants in common. As the statute uses the law word "waste," we must give it the legal meaning as applied to tenants for life. *Elwell* v. *Burnside*, 44 Barb. 447. Chapter 100, section 14, Code 1891, gives an action of account between tenants in common for receiving more than his just share,—that is more than his just share of rents and profits from the legitimate use of land; but this has no reference to waste. It does not license waste. There stands section 2, chapter 92, branding it as a tort, and giving action for it, and it applies though one claim title to the whole, and commit waste. 28 Am. & Eng. Enc. Law, 895. As owner of three-tenths in fee, Jones could not bore for oil, any more than a stranger, because the act, whether done by a co-tenant or stranger, is a wrong. For this purpose he was a stranger, so far as the wrongful character of the act is concerned. He had right to possession for residence or other ordinary use working no injury to the inheritance, and therefore we term his act waste, not technically trespass as done by a stranger. "Waste is an injury to the freehold by one rightfully in possession. This marks the distinction between waste and trespass." 1 White & T. Lead. Cas. Eq. 1011. But the nature of the act is a tort in both cases; the same in both. Of course, a stranger would be liable for trespass; or, if he converts the oil from realty into personalty, the injured co-tenant may waive the trespass, and go for the value of the oil, or for the money for which the trespasser sold it. Indeed, Jones claimed to own the whole land, repudiated any co-ownership with the Hickman heirs, and thus assigned to

himself the position of a stranger. This, however, only strengthens the argument that he is to be regarded a wrong-doer against the owners of the seven-tenths, as the statute makes him a wrongdoer though he were regarded as a tenant in common. It is therefore immaterial to define his exact caste; whether we regard him as a tenant in common or stranger it is the same. If oil wells had been already opened, Jones, as co-tenant, might set up claim under his three-tenths interest to work them, and take all profits under some cases. [*McCord* v. *Mining Co.* (Cal.) 27 Pac. 863] ; though I should think he would have to account under section 14, chapter 100, Code. *Rust* v. *Rust*, 17 W. Va. 901. That would be no wrong; not waste. His life tenancy would give him the right to take all the oil. But there were no oil wells on it, nor any precedent authority to open any. He first pierced the soil in quest of this fluid of fabulous wealth. He had no right to pierce it to get even his three-tenths of the oil. If he chose to do so, of every gallon seven-tenths belonged to the owners of the seven-tenths in the land, because it had been part of their soil. These considerations repel all idea that as owner of the fee in three-tenths he could penetrate the soil, and convert to his sole use, without accounting, all the oil raised. It is true, an expression in a former opinion in this case said that Jones, as owner of three-tenths, had right to bore for oil, so he took no more than his share. This is not announced as law in the syllabus. On examination I find no warrant for this expression. The only materiality for this is that it may be claimed to enter into the process of the accounting for the oil, as, if its extraction was lawful, the charge against Jones might be different from what it would be if regarded a wrongdoer. It is, however, sought to be made by counsel a weapon of great potency. Counsel say that this Court in the former opinion said that, the act of boring being lawful, and lawfulness of severance gave him who severed it the right to keep the whole, just as the right to use open mines by a life tenant gives him all the product, because he has right to sever. But in this case the severance is unlawful, and the legal deduction fails. Counsel from that expression would say further that when David Hickman, as owner of the seven-tenths, gave Mrs. Williamson a life estate, as he must have known as a matter

of law that the owners of the other three-tenths would have the right to produce oil, he must be understood as contemplating that they might do so, and is to be taken as intending, if they did, that the life tenant should enjoy all the seven-tenths of the oil. As the owners of the three-tenths had no such right, the argument here again fails. In addition, this would give the life tenant, by mere implication (remote and weak implication at that), a right to what her devise did not carry as an incident,—things a part of the soil, which can only go with it by express grant. It is argued that Hickman, in his devise of a life estate to his favorite daughter, Mrs. Williamson, did not prohibit waste; but as Judge Roane said in *Findlay* v. *Smith*, 6 Munf. 148, exemption from waste cannot result "from the omission to restrict waste in the will. That omission became unnecessary from the limited nature of the estate granted. The estate granted was only an estate for life, and it is incident thereto that waste shall not be committed. It would have been a work of supererogation to have inserted such a restriction, and the question may properly be retorted, why, if it were so intended, was not waste specially permitted by the will? This is not only not done, but the contrary is done, by granting an estate which carries with it the restriction as an incident. The silence of the will, in this particular, cannot weaken the rights of those in remainder. It cannot destroy rights conferred by law." At one time, to restrict a life tenant from waste, there must be a restriction in the grant; but now all tenants are forbidden to do waste by statute, unless their grant render them expressly unimpeachable for waste. 2 Minor, Inst. 616, 619; 1 Lomax, Dig. 56; 1 Washb. Real Prop. 107. Of course, when that which is a part of the realty is unlawfully severed, it belongs to him who has the first vested estate of inheritance at the date of severance, as he owns it. *University* v. *Tucker*, 31 W. Va. 621 (8 S. E. 410); Fearne, Rem. 341; *Whitfield* v. *Bewit*, 2 P. Wms. 240; 1 Lomax, Dig. 56. The owner of the severed chattel can alone seize it, or bring trover for its conversion, as it came from the inheritance, or claim the thing itself by replevy, or detinue, or bring trespass *de bonis asportatis*, for damages for the taking of it, or *assumpsit* for money had and received from it. "Nor does it matter

whether the timber is cut by a stranger or by the tenant (for life) himself, since the tenant cannot convey any interest in it when severed." 1 Washb. Real Prop. 119; 1 Lomax, Dig. 59; Freem. Coten. §§ 297, 302. For the same reason the co-tenant doing waste neither owns nor can sell what is not his. "If at the time of the improper working there is any person in being entitled, defeasibly or indefeasibly, to an estate of inheritance, the property in the severed chattels, or the amount to be accounted for, will belong absolutely and immediatly to such person, or, if more than one, to the first of such persons, and his right is not affected by the circumstances that between his estate and that of the wrongdoer is interposed in the order of the limitations an estate for life in being even without impeachment of waste." McSwinney, Mines, c. 3, § 2 (B). p. 99; 1 Lomax, Dig. 56, 57; *Pigot* v. *Bullock*, 1 Ves. Jr. 479; *Birch-Wolfe* v. *Birch*, L. R. 9. Eq. 683. This shows that Jones, as owner of the life estate intervening before the seven-tenths would be vested in possession could not keep the oil. "Oil in the earth belongs to the owner of the land, and when unlawfully taken therefrom by a wrongdoer the title of such owner remains perfect, and he may pursue and reclaim it wherever he may find it." *Hughes* v. *United Pipe Line*, 119 N. Y. 423 (23 N. E. 1042). It may be said that these doctrines would leave the part owner powerless to get any benefit from the oil. If so, it must be as a quality of his estate. But it is not so; for, if he wished a partition, he was entitled to it, and thus could bore on his separate share, and take the oil on it, and perhaps drain all from the other, and hold it acquit of account for it; and, if he did not wish partition, oil being capable of loss from wells on lands near by, perhaps he could ask a court of equity to allow him to bore, and take his share of the oil, and pay the balance to the remainderman, like that jurisdiction exercised by equity to direct timber in a state of decay to be cut down for the benefit of those entitled to the inheritance, if it would do no damage to the life tenant, compensating him for the use of the land. Here Jones was himself the life tenant. 1 Lomax, Dig. 60; Story, Eq. Jur. § 919. Thus the owners of the seven-tenths in the land had plain legal title, and their rights are such as above given to seven-tenths of the oil,

unless something not yet considered debars them from such rights.

It is urged strenuously, with great elaboration and ability, by counsel, that they are barred by the doctrine of estoppel *in pais*; that their conduct works this result. Here I first remark that a clear legal title to land, requiring written conveyance to transfer it, is, by this theory, to be devested out of its owners, and invested practically as effectually in others as if such conveyance existed. A clear, strong case of estoppel is required for such a result. What is the conduct of these parties bringing about this result? As to Mrs. Williamson, she having procured the decree of sale, and received its proceeds, is estopped. That is *res judicata* under our former decision. As to the other devisees of David Hickman, what have they done or left undone to estop them? It is said they ought to have made themselves parties to this suit. There is no force in this. Perhaps they did not want their land sold. There was no ground for the sale of their remainder for the debts of Thomas Jones, deceased, except perhaps one of their seven-tenths, as Jones' heirs had conveyed their interest before the suit. If anybody wanted to sell their land for debt, or because partition could not be made, or other cause, he must bring them and their estate before the court. Strange that any one is to lose his land because he did not cause himself to be sued. Counsel for Jones make their chief point under this head of estoppel by saying: "Because these plaintiffs stood by for eighteen months, and made no claim to the land or oil, knowing that Capt. Jones in good faith, and believing he had a perfect title in fee simple to the farm, was making great expenditures on the land in developing it as oil territory, and had paid forty thousand dollars to buy interests of his co-purchasers, Tennant and Haskell, and paid up the deferred installments of the purchase money for the land, which he would not have done unless he had believed that he had the sole and unquestioned title thereto, the said plaintiffs intending, if Captain Jones succeeded in developing the farm as oil territory, to bring this suit. If he did not succeed, they would let the sale stand without attack, and they would finally take and enjoy the avails and proceeds of the

same." By no means does the evidence sustain these predications.

Admit, however, these as facts, they do not bar the plaintiffs. *First,* they do not predicate, nor does any evidence, any contract between the parties, giving Jones a right. The plaintiffs stand in no wise bound to Jones by any contractual relation. Then, to bar them, you must show such conduct as is misconduct amounting to fraud, and this is not shown by these facts, or others in the circumference of the case. Most of the cases cited to support this estoppel are cases in which there was privity or obligation springing from contract, or constructive or other trust. Such are *Clark* v. *Hart,* 6 H. L. Cas. 633; *Sumner* v. *Seaton,* 47 N. J. Eq. 119 (19 Atl. 884); *Galliher* v. *Cadwell,* 145 U. S. 372 (12 Sup. Ct. 873). There is no contract or trust here. Not the slightest obligation under contract, trust, or fiduciary relation bound these Hickman devisees to Jones. Let us see what is an estoppel by conduct. Let us see whether the defendants can meet its requirements. "An estoppel *in pais* operates where a person has made an admission or done an act with intent to influence the conduct of another, or that he has reason to believe will influence his conduct, inconsistent with the evidence he proposes now, or with the claim or title he proposes to set up, where the other party has been influenced by and has acted upon it, and where he would be prejudiced by the allowance of the claim or title set up." JUDGE ENGLISH in *Railroad Co.* v. *Perdue,* 40 W. Va. 454 (21 S. E. 755), says that for an estoppel *in pais* there must be conduct, acts, language, or silence amounting to a representation or concealment of material facts, and the misrepresented or concealed facts known to the party sought to be charged with the estoppel, and unknown to the other party, and the conduct must be with the expectation that it will be acted on, or will likely be; and JUDGE ENGLISH further said: "The general rule is that, if a person interested in an estate knowingly misleads another into dealing with it, as if he were not interested, he will be compelled to make his representation good. It applies to one who denies his own title or incumbrance when inquired of by another who is about to purchase the land, or loan upon it; to one who knowingly suffers another to deal with

the land as though it were his own, or to expend money in improvements without giving notice of his own claim or the like. In the light of the most recent decisions, to preclude the owner of land from asserting his legal title under such circumstances, there must be shown either actual fraud or negligence equivalent to fraud in concealing his title, or that he was silent when the circumstances would compel an honest man to speak." The plaintiffs never accepted a dollar of the sale of the land under the decree. These plaintiffs were not at the judicial sale, standing by silent, or at the place of improvement; never said a word denying their title; never renounced it; never induced Tennant or Jones to buy or bore, never were inquired of as to their title, never were placed in such circumstances as to call upon them legally, nor perhaps even morally, to speak out. All they are guilty of is silence, quiescence. They did not, it is true, seek Jones, and warn him. This is their offense, in length and breadth. Under the doctrine of estoppel above given, this is not enough. Bigelow, Frauds, 590, says: "Having now considered the subject of deception by act on all sides, we are next brought to the subject of deception by omission; in the case of silence, where there was a duty to speak. Now, silence alone, it may be declared as a general rule, is not unlawful in transactions between men at arm's length, however great the advantage gained thereby. A man's unpublished thought is surely his own. But it must be understood at the outset that by silence we mean entire silence, as distinguished from that sort which merely keeps back part of the truth told or suggested. But, speaking of pure silence, the general rule stated is very strong. It governs even though the silence is meditated, and with knowledge that the other party was laboring under mistake or ignorance." These people were not bound to volunteer to warn Jones, and we can the more excuse them for silence and inaction —all they are guilty of—when we reflect that, if they knew anything about the title's condition, they knew Capt. Jones held the life estate, and they would have no right to possession until its end, which exculpates them from any animadversion for intentional wrong.

Again, it is not clear they knew their title, especially as some—nearly all—were infants and married women. If a

business man like the defendant could not judge correctly of his title, could they? Morever, I say that if one man chooses to go upon another's land, and clear and improve it, the mere failure of the owner to go to him and warn him not to do so will not take away the true owner's title. He is given the time fixed by the statute of limitations, though he do know that his adversary is expending money in improvements. He may every week pass along and see the work. Mere silence will not rob him of title until time does the work under the statute. Unless there is a duty to speak out, one need not. "To create a duty to speak, it must be known by the one keeping silence that some one is relying on that silence, and is either acting or is about to act as he would not have done had the truth been told." *Veile* v. *Judson*, 82 N. Y. 40. There is no proof that these parties knew Jones was relying on them or their silence, and in fact he shows himself he did not. But I say the test just put in the New York case is not strong enough. Mere silence and knowledge that another is relying on it is not enough. He must be brought into such close quarters or situation towards him as to call on him to speak out. Again, a potent fact against Jones on this estoppel is that before Tennant, who, as his agent, bought af the judicial sale, Jones knew of the defect of the title.

1. The record in the cases stated that Thomas Jones died leaving ten heirs; and the petition of Engle and Williamson, on which the sale of the whole tract was first based, stated that Eliza Williamson only owned a life estate in seven-tenths. Who owned the remainder? The very decree of sale declares: "It appearing to the court that the interests held by C. Engle as trustee as aforesaid are for the use and benefit for life of Eliza Williamson by virtue of a provision in the will and codicil of said David Hickman." Who owned the remainder? This record put this question to a purchaser. Prudence would make a man inquire where the real estate in the land was. A purchaser at a court sale purchases under the rule of *caveat emptor* (look out buyer). The court or commissioner warrants nothing. One buying at such a sale is held—conclusively held—to have notice of all the facts which the record, if inspected, would communicate. *Stout* v. *Mercantile Co.*, 41

W. Va. 339, (23 S. E. 571) ; Pom. Eq. Jur. § 626 ; *Wood* v. *Krebbs*, 30 Grat. 708 ; *Burwell* v. *Fauber*, 21 Grat. 446. Where one claimed for improvements, such record notice was held enough to debar him as showing that he did not improve with *bona fide* belief that his title was good. *Hall* v. *Hall*, 30 W. Va. 785, (5 S. E. 260). Jones had actual notice of this defect of title, and of the fact that the plaintiffs owned the seven-tenths as the remainder. He, as a witness, says his agent, Tennant, to procure oil leases, reported to him that a lease of this land from Mrs. Williamson would not be safe, "as she only owned part in fee and a life interest in the balance," and the only way was to buy it. This knowledge defeats his plea of estoppel under cases cited above, and *Bettman* v. *Harness*, 42 W. Va. 433, (26 S. E. 271), and *Dawson* v. *Grow*, 29 W. Va. 333, (1 S. E. 564). A small modicum of prudence would have saved him. He heeded not this warning, but venturesomely risks a purchase, and the expenditure of his money. He was not moved by any words or act or representation of the plaintiffs, nor by their silence, but hazarded his action in the spirit of speculation, not relying on their silence, but his own judgment. Jones says he claimed the whole, and would not have heeded the claim of the plaintiffs, if they had made it. It would not have stopped this expenditure. How can he lay his misfortune at their door? His counsel argue that the commissioner who sold, told him it was a good title. Jones says he did not say he did so until July, 1893, and he had then bored all but two or three wells. But, what if he did? Are these plaintiffs responsible, even if the lawyer told him that it was not necessary to make the remainder-men parties? This mistake, in legal opinion, does not bind the plaintiffs. He was not their lawyer. He had no authority, as commissioner, to bind them, or guarantee title, and they were not parties to the suit even. It is argued that the sale was made under decree with the knowledge and desire of the remainder-men, and this position is sought to be supported on circumstances entirely inadequate to sustain this contention. The judge who rendered the sale decree was father to children of one of the remainder-men, the commissioner was husband to another, and a son of David Hickman performed the clerical work of recording the de-

cree; and the remainder-men must therefore have known of, and been satisfied with, the decree, say counsel. This does not follow. Suppose they did know it, and were satisfied. If they did nothing active, it is not enough. One with legal title to land cannot, by oral disclaimer of right, even the most expressed, devest himself of legal right. *Cline* v. *Catron*, 22 Grat. 378; *Jackson* v. *Davis*, 15 Am. Dec. 451.

Counsel would explain why these remainder-men were not made parties, saying the lawyer in the case thought, as Jones' heirs were parties, and Mrs. Williamson owner of a life estate in seven-tenths and three-tenths in fee, they were not necessary parties, as Hickman purchased shares of Jones' heirs after his death, and they were liable to his debts. They were not liable, except one of the seven-tenths; and anyhow they owned legal title to the remainder in fee, and were absolutely necessary parties, and neither they nor their estate were before the court, and their estate was not sold under the decree, and it was a nullity as to the remainder-men. No matter who made the mistake in the conduct of the suit, or how it came about, it could not prejudice these remainder-men. They can be bound only by record, not by a mere supposition, or even proof, that they knew or approved of it. The decree and deed under it conveyed no title. Mrs. Williamson, though before the court, was only life-tenant of the seven-tenths, and there is no privity between life tenant and remainder-men, so that the presence of a life tenant as a party by representation makes the remainder-man a party. "A stranger, who is not a party or a privy, can neither be barred nor aided" by a judgment or decree. Bart. Ch. Prac. 213; 2 Pom. Eq. Jur. § 813. Engle was a dry trustee; the real owners of the remainder were the remainder-men. The trustee could not represent their interest. Even a creditor under a deed of trust, not merely a trustee, must be a party; much more the remainder-man in a case of dry trusteeship, where it is proposed to sell the very *corpus* or fee of the land, and all rights whatsoever therein. It is essential that there be before the court not merely the owner of particular estate, but also the owner of the first vested estate in reversion or remainder, and this was in these remainder-men. 1 Daniell, Ch. Prac. 227, 228;

Story, Eq. Pl. §§ 144, 145; Opinion, *Faulkner* v. *Davis*, 18 Grat. 684. The trustee and life tenant not representing the remainder-men, and they being necessary parties to bring the fee of the land before the court, they are not bound by the sale. But this was decided on the former decision. Counsel ask, why, if the plaintiffs did not acquiesce in the sale, did they not adduce evidence to show that they did not? The burden to show acquiescence is on the defendant asserting it. Mere acquiescence, if proven, would not devest their title. If these parties knew of the sale and boring, which is only by mere inference, there is evidence tending to show that they thought it was only Mrs. Williamson's interest that was sold, as she is shown to have been anxious to get rid of the land. It is not clear they knew of it; but, what if they did? Can their land be taken from them merely for that? So I conclude that estoppel *in pais* will not defeat the plain, legal right of the plaintiffs. But, as some of them were infants and married women, even if there were facts to show such estoppel as is here contended for, it would not bind the married women or infants. They would not be guilty of such a fraud as would estop them.

The title of these plaintiffs vested before April 1, 1869, and therefore the interests of the married woman were not separate estate. A distinction is made in a brief between land that is separate estate and that not separate estate, the theory being that as to separate estate the married woman may lose it by estoppel *in pais*, whereas she cannot so lose land not separate estate; but as, under our statute, her sole deed is void in both cases, and she could only pass either class of land by a deed with privy examination (when this transaction occurred), and now by acknowledgements, her husband joining, I do not see where any distinction comes in. Whether a married woman, by positive, intentional fraud, can lose her land, when her sole deed will not devest her of it, the authorities are divided. I should say that, as the law scrupulously limits her power of alienation to one only mode, she could not do so; that she could not do indirectly what she could not do directly by a solemn deed, because it is the policy and positive provision of statute that she shall be disabled by an act of hers to part with her land except in one way. Bige-

low, Estop. 599; Bish. Mar. Wom. § 488; 2 Herm. Estop. § 1102. Note that I am speaking of her losing her land, not personalty, for I think she may thus lose her personalty, as she is competent to sell that. But in this case no affirmative act of fraudulent representation is shown; only silence. If I be right in the position that actual fraudulent representation would not lose her right, for stronger reason mere silence would not; but, even if positive, affirmative fraud would lose her land, mere silence would not. 14 Am & Eng. Enc. Law, 643, says that, as "such estoppels as arise out of failure to assert a right, or out of silence or acquiescence in the right claimed by others, arise only because from such silence and acquiescence a representation is implied, it is clear that a married woman can be bound by silence and acquiescence only in cases where she would have been bound had she expressly made the statement implied. Thus, where a married woman makes a void deed, she is not estopped, by afterwards recognizing its validity, and allowing the grantee to improve the property, from asserting her title, for she would not be estopped therefrom by expressly telling the grantee that she would never claim any title thereto; but, if she could contract as a *feme sole,* and allowed the grantee to improve the property on the faith of a title given him by her, she could not deny the validity of that title." It is cautious to observe that the law books say that, in order that a fraud by a married woman shall constitute an estoppel against her, it must be unconnected with a contract, because, as her contract would be void, her mere conduct connected with it would not operate to enforce it; but that was when she was disabled from contracting; and, now that our statute has fully enabled her to contract, I think that any fraudulent act which would estop her when not connected with a contract would also do so though connected with a contract. This limitation proceeded from her disability, and, that having been removed, the limitation would be removed. Bish. Mar. Wom. § 493; 1 Pom. Eq. Jur. § 418; *Tufts* v. *Copen,* 37 W. Va. 629 (16 S. E. 793). But observe, further, that as to selling and conveying her land she remains under limited disability. Wherefore I am clearly of opinion that the mere silence or inac-

tion of the married women—their quiescence, for it is not acquiescence—does not bar them.

How as to infants? Positive intentional fraud would bar an infant of years of discretion, but mere silence or quiescence surely will not. I think the weight of authority is that matter sufficient to raise an estoppel, if unconnected with a contract, would bar an infant from asserting a right even to land. It must, however, be intentionally fraudulent. Mere silence or quiescence, as in this case, will not do so. Bigelow, Estop. 600; 2 Pom. Eq. Jur. § 815. The deed of a married woman is void; an infant's only voidable,—a difference.

I have discussed the question whether or not the plaintiffs are barred by the doctrine of estoppel *in pais* as an open question unaffected by the former decision, though it may be said plausibly that it did decide against that defense, in deciding that Jones must account on some basis. If a good bar, he would not have to account, and the court would have dismissed the bill. That decision did not decide finally that Jones rightfully bored for oil. It did not decide how much Jones should be charged, nor on what basis. That decision was, in terms, in these matters, not final, but provisional.

There cannot possibly be anything in the contention that laches bars relief. The delay from the judicial sale was only eighteen months; from the commencement of boring, some less. The statute of limitations gives ten years. The many cases of laches cited are cases of deeds or other things procured by fraud, as in *Whittaker* v. *Improvement Co.*, 34 W. Va. 230 (12 S. E. 507), where there must be promptness. Here is no such case, but simply one in adverse claim of another's land, or ouster by one tenant in common, or a suit to make Jones account for oil taken from the land; the statute giving five years. Why, in such case, plead laches short of the period fixed by statute? Viewed as a suit to recover possession,—but it is not,— time would not begin until the end of the life estate. *Merritt* v. *Hughes*, 36 W. Va. 357 (15 S. E. 56); *Arnold* v. *Bunnell*, 42 W. Va. 473 (26 S. E. 359). Time has no weight in any view of this case.

Having reached the conclusion that the plaintiffs have right to relief, the next question is as to what shall be

charged to Jones, or the mode of account. It is not questioned, but may be stated as law pertinent to the case, that, though action at law in case for waste, or trover, or trespass *de bonis*, or perhaps pure trespass would lie, yet equity can take the account. It has indubitable jurisdiction for an injunction to restrain the waste. *Bettman* v. *Harness*, 42 W. Va. 433 (26 S. E. 271); *Williamson* v. *Jones*, 39 W. Va. 231 (19 S. E. 436). Having jurisdiction for one purpose, it will go on to do complete justice to avoid multiplicity of suits. *Chrislip* v. *Teter* 43 W. Va, 356 (27 S. E. 288). And with respect to a suit of this particular cast to enjoin waste, it is clear equity will take an account, and give compensation for damages. Story, Eq. Jur. § 517; 1 Washb. Real Prop. 126. As above stated, Jones had no right to any of the oil as life tenant. As owner of the three-tenths of the land, he had no right to produce the oil, and his act in so doing was one of waste. When he did extract the oil, seven-tenths of it was by right and title oil of the plaintiffs, the very oil itself, because taken from their land. Jones converted this, their property, to his own use. They are entitled to recover the money he received for it, if ascertainable; if not, its value. It is urged that in a former opinion it is said that Jones had right to bore, so he did not take more than his share of the oil. Would not that leave the balance the property of the plaintiffs? I do not see that this expression that he had right to bore is material, unless it show, as counsel seeks to use it, that having the right to bore, Jones had the right to keep all the oil; but that the opinion in words denies. The plaintiffs owned seven-tenths of the oil when it reached the surface. It has been converted to his own use by Jones. He claiming all the land, would be an ouster, took the oil under adverse hostile claim, as an act of trespass. Indeed, the plaintiffs can treat it as an ouster. It is not a question of rent in the shape of royalty of one-eighth of the oil or otherwise, for royalty is rent, and springs from contract; and there was nothing contractual between these parties. If a stranger had bored, could the plaintiffs not render him liable for the conversion of their oil? Jones is as a stranger, a hostile claimant shutting them out; and, even if he had not claimed the whole land, but acknowledged their right to part of the land, the

taking of the oil was waste, and gave him no right to their share. The former opinion says this.

It is claimed for Jones, if he is not allowed all the oil, he should pay only one-eighth of the seven-eighths as royalty. If he had worked already open wells, it might be more plausible to say so; but he first penetrated the soil as a wrongdoer, in a legal view. If an open well, it would be lawfully used by a life tenant, and probably by a tenant in common, as one mode of enjoyment of his share. I say probably. That matter is not before us. *Rust* v. *Rust*, 17 W. Va. 901, holds that where one tenant in common occupies the whole property he is liable to co-tenants for a reasonable rent for it in the condition it was in when he took possession. This is approved in the opinion in *Dodson* v. *Hays*, 29 W. Va. 601 (2 S. E. 415). This doctrine follows *Early* v. *Friend*, 16 Grat. 21. In the two West Virginia cases the use of the land was for ordinary purposes, not extracting minerals, and the occupying tenant had right to occupy and farm the land. The *Early Case* was the use of a salt well opened before the commencement of the co-tenancy, and perhaps the use of the salt water in making salt by the occupying tenant was lawful, as the use of the land in the condition it was in when he went upon it, and as it had been used by the ancestor. And besides, between him and some of the co-owners, there was a stipulated rent, which the judge gives as a reason for the charge of a rent; and besides he says the occupying co-tenant and the others regarded it as a renting. And the court refrained from laying this down as an inexorable rule, saying there might be cases calling for an account of rents and profits. The case in hand is a case of a different hue; not the case of one cropping the land in that legitimate use which a tenant in common may make of the land; not use of open salt or oil well, which likely can be used by one tenant as it had been before; but where one pierces the earth, and takes from its place oil that is a part of the realty,—an act not of legitimate use, but destruction and waste of the inheritance of the others. Almost an exactly similar case to the one in hand is *Ruffners* v. *Lewis' Ex'rs*, 7 Leigh, 720, where persons claiming adversely to plaintiffs were held tenants in common with them, and had sole occupation, and had discovered salt,

and bored wells.   Great controversy arose as to the mode of
charge against them.   Held chargeable, not with rental,
but rents and profits, if any made, with credit for expenses
and improvements.   *Graham* v. *Pierce*, 19 Grat. 28, is like
unto this case.   It was a case of lead mines, where parties
jointly operated them for a time, and one continued to use
the open mines.   President Moncure said :   "The court is
further of opinion that although, as a general rule, where one
tenant in common occupies and uses the common property to
the exclusion of his co-tenants, or occupies more of the com-
mon property than his just share or proportion, the best
measure of his accountability to his co-tenants may be their
shares or proportions of a fair rent of the property so occu-
pied and used by him, according to the principle laid down in
the case of *Early* v. *Friend*, 16 Grat. 21, 52, yet, as was said
in that case, there may be peculiar circumstances in a case,
making it proper to resort to an account of issues, profits,
*etc.*, as a mode of adjustment between the tenants in com-
mon.' *Id.* 54 ; *Ruffners* v. *Lewis' Ex'rs*, 7 Leigh 720." "Un-
der the circumstances of this case it was proper to resort
to an account of issues, profits, *etc.*, as a mode of adjust-
ment between the tenants in common.   It is not a case of
land used for agricultural purposes only, in which there is
no difficulty in ascertaining a fair rent for the use and oc-
cupation ; nor is it such a case as that of *Early* v. *Friend*,
where the property consisted of salt works, the yearly
value of which might be ascertained with reasonable cer-
tainty, and where a money rent had been contracted for
and paid to some of the tenants in common, which fur-
nished a standard for ascertaining the amount due to oth-
ers ; but it is the case of a lead mine, the yearly value of
which, and more especially of an undivided and uncertain
portion of which, is incapable of ascertaiment.   Nor would
it be just, in settling the account of issues and profits, to
charge the occupying and operating tenants with a certain
sum *per* ton for the quantity of ore raised from the mine,
or to credit them with an estimated sum *per* ton for raising
the ore and manufacturing the lead, as contended for by
the appellants.   Such a mode would be founded on con-
jecture merely, and would be very unequal and unjust, as
it could not be known what would be the cost of raising
ore, which would depend upon its situation in the mine, its

degree of richness, and the facility or difficulty of getting at it, as well as upon the uncertain price of labor; nor what would be the cost of manufacturing lead, which would depend upon the varying price of labor and supplies. The best mode of settling such an account, and one which is perfectly just, supposing the tenant to have been capable and faithful, is to charge him with all his receipts, and credit him with all his expenses, on account of the operation of the mine.'' If the difference in the nature of a lead mine and a salt works was such as to require in the case of the former an account of rents and profits, with how much more force are we driven to the conclusion that in a property such as that in the case at bar; consisting of oil wells, the yearly value of which was still more uncertain and difficult of ascertainment, in which the cost of operation is still more uncertain than that of the lead mine, the account must be taken as one of rents and profits.

In *Newman* v. *Newman,* 27 Grat. 722, the court had to determine the basis of an account between co-tenants of an iron mine. On pages 722 and 723, President Moncure refers to the cases of *Graham* v. *Pierce,* and *Early* v. *Friend,* and quotes from *Graham* v. *Pierce,* the distinctions between the two cases there stated. The opinion says: ''That was the case of a lead mine, while this is the case of an iron mine; and there seems to be no difference in principle between them on the subject we are now considering. A tenant of such property necessarily uses a part of the subject itself, and maybe such uses render the residue of the subject of little or no value. It may be discovered by explorations and operations that the property is of great value, or the contrary. To rent it for a certain sum is to make a bargain of speculation and hazard, which is always objectionable in such cases, as it is almost sure to operate unequally on the parties; whereas to carry on operations upon it for the joint and equal benefit of all the owners in proportion to their respective interests in the subject, and by the agency of persons (whether they have an interest therein or not) who may be amply compensated for their trouble, complete justice will be done to all parties concerned. It may be said that to carry on the business required a capital, which one of the parties did not have. But that matter may be adjusted by allow-

ing interest to the party who advances the capital. In this case the property was of known and established value, and there would probably have been no difficulty in finding a suitable agent, and borrowing the necessary capital to carry on the operations, even if both had not been readily furnished by one of the parties." As counsel say: "Here are pointed out other facts which are also found in the case at bar, and which, it seems to me, are controlling, and require the application to this case of the rule in *Graham* v. *Pierce*. These facts are that the development of oil property necessarily uses part of the subject itself more rapidly and completely than in the case of a lead mine, and renders the residue of the subject of no value whatever. It is even more true of an oil well than a lead mine that explorations and operations may show that it is of great value, or the contrary. The speculation and hazard are more in the case of an oil well than in that of a lead mine. Indeed, all that is said by Judge Moncure in *Newman* v. *Newman*, as quoted above, is applicable with added force in the case at bar. In both the Virginia cases in which a rent was charged (actually in one, nominally in the other) the property consisted of open mines, and the parties interested had theretofore settled accounts on the basis of a rent. Neither of those facts exist here, where the wells were not open; no rent had theretofore been charged, and the inheritance itself was being taken."

In *Dodge* v. *Davis*, 85 Iowa, 77, (52 N. W. 2), an instruction was held proper (pages 81, 82, 85 Iowa, and page 3, 52 N. W.) that a tenant in common was entitled to recover from a defendant co-tenant, who had ousted him, claiming exclusive right to use the land, in addition to a fair rent for the use of the premises, his share of the fair market value of the trees or timber, if any, that defendant sold to third parties off of said land. In *Huff* v. *McDonald*, 22 Ga. 131, relating to a gold mine, it was held: "A tenant in common, who receives more than his share of the profits of the common property, holds the surplus as baliff for his co-tenant, who therefore stands to him as principal. He consequently is bound to pay his co-tenant the actual profits which he has made out of such surplus, as well as the surplus itself." In *Hayden* v. *Merrill*, 44 Vt. 336, the defendant co-tenant was held liable for profits, and not for

rent. In *Shepard* v. *Richards*, 2 Gray 424, the inquiry was to the profits received, not the rent due. In *Pearson* v. *Carlton*, 18 S. C. 47, an account for rents and profits (page 49) was held proper (pages 53, 54). This was a case where land was sold under decree where an heir was not a party, and he was given partition and rents and profits. ·That case refers to *Jones* v. *Massey*, 14 S. C. 292, which held that the accounting should be of rents and profits, and not of rental value. Such was the accounting in *Dewing* v. *Dewing*, 165 Mass. 230, (42 N. E. 1128). In *Winton Coal Co.* v. *Pancoast Coal Co.*, 170 Pa. St. 442, (33 Atl. 111), the court, after construing the statute of Anne, say: "Where the co-tenant has actually received the rent of the common property, or has converted coal, timber, gas, oil, or minerals —part thereof—into cash, and retains a share thereof which actually belongs to his co-owner, there. would seem to be no good reason why, in a proper case, he may not be sued in *assumpsit* for his co-tenant's share thereof." See also, *Fiquet* v. *Allison*, 12 Mich. 328; *Loomis* v. *O'Neal*, 73 Mich. 582, (41 N. W. 701); *Tuttle* v. *Campbell*, 74 Mich. 662, (42 N. W. 384). "In *Job* v. *Potton*, L. R. 20 Eq. 84, the court regarded the defendant co-tenant as having been in all respects blameless, not a willful wrong-doer against whom the accounts would be taken rigorously, not negligent or tortious; so that, while he would be allowed for bringing the coal to the pit's mouth, but not for the expense of severance, but as having produced the coal in the exercise of a strict right (page 97), and decreed· an account against the defendant for the value at the pit's mouth of the coal raised, less the cost of getting and raising it. The idea that he should be dismissed on payment of a rent does not seem to have occurred to any one."

It does seem ·to me on authority and reason that an account of rents and profits is the true basis. I cannot see how, where there is no lease, no contract, no tacit understanding between the parties, no past mode of business, but one not the true owner has used and received rents and profits from land of other people, you can charge an annual rental, and not their fraction of rents and profits received by the occupier.

What is to be done with the money to which the plaintiffs are entitled? Does it go to them at once, or is it to be put at

interest, and Jones, as life tenant, get the interest on it, during Eliza Williamson's life, or a certain sum for its present worth?

As above shown, by reference to McSwinney on Mines, it goes at once to the plaintiffs, and Jones has no right to interest on it during the life estate: (1) Because he is, in a legal point of view, a wrongdoer, and, if given interest, this would give him the benefit of his own wrong. In *Williams* v. *Duke of Bolton*, 1 Cox, Ch. 72 (3 P. Wms. 268), a tenant for life committing waste, who owned the next existent estate of inheritance, subject to an intermediate contingent remainder, was not allowed to take advantage of his own wrong in cutting timber, but the fund was kept for the contingent remainder-men, and he was made to pay interest on it from the time the money for the timber was received. There are instances where the reversioner or remainder-man, during a life estate in another, wrongfully severs minerals, the proceeds are invested, and the income paid to the life teant during life, though the minerals really belonged to the wrongdoer, because he could not take advantage of his wrong against the tenant. McSwinney, Mines, 65. This is doubtful, but shows how far courts go against one doing the unlawful act.

(2). Jones is not entitled to interest, because he did not own a drop of the oil belonging to the owners of the seven-tenths. He is not entitled to the oil, and, of course, is not entitled to the income of interest from its proceeds.

The decree gave the collateral heirs of Dr. Weirich, husband of Laura Weirich, shares in the amount charged to Jones for the oil. I think this was error. Laura Weirich was a child of David Hickman, outliving her father, dying childless, leaving her husband, to whom by her will she gave all her interest in the estate of her father, "both as legatee and residuary distributee under his last will." The will of her father gave her a legacy of six hundred dollars and some silverware. By clause fourteen he provided that his real estate not before disposed of (and this land had been given to Mrs. Williamson for life with remainder to her sisters) be sold, and out of it and his personalty his debts paid and the bequests he made, and the residue divided equally among his daughters, among them Laura Weirich. The will of Laura Weirich would give her husband her legacy of six hundred dollars and the silverware, and her

share in the residue arising from the sale of land and personalty, as the words, "both as legatee and residuary distributee," would in their legal import imply. They are subjects fitting those words in their legal meaning. She gave, too, "subject to certain devises and bequests hereinafter to be made," but made bequests,—no devises,—but used improperly the word "devise" in making bequests, tending to show still further that she had her mind on personalty, not realty. Her will gave nothing in this land. Hence her husband got no interest in this land, and she died intestate as to it; and as she died before the Code of 1868, and under the reign of clause 3, s. 1, c. 123, Code 1860, it would go to her sisters, the plaintiffs, not to the husband, under section 1, cl. 2, c. 78, Code 1868. And besides, she died under Code 1860, and chapter 122, s. 3, allowed a married woman to make will only of her separate estate; and this was not separate estate, because it vested in her before our first separate estate act (chapter 66, Code 1868).

As to the alleged error in not decreeing that the purchase money under the judicial sale, paid by the purchaser, be refunded to the purchaser, that was not cognizable in this case, but by some proceeding or step in the case in which the sale was had, or other independent proceeding, whatever it may be.

This decision may be burdensome to Jones, who appears to be a man of great energy, business capacity, and merit, and I will not conceal the wish that we could, consistently with law, be more favorable to him; but we are bound by the law, seemingly very plain, and in itself logical and well established. The plain and simple showing of the voluminous record and contestation in this case is that he has taken sole and exclusive possession of land belonging in greater fraction to others, and of his own accord drawn from it vast quantities of oil belonging to them in clear law, and sold it, and reaped rich return, and the true owners demand their own under the law. If he was mistaken in his own judgment as to the title, or from misadvice, it is a misfortune that is to be regretted, but for which the plaintiffs are not legally responsible; and if he knew of the defect of title, and he surely had enough to warn him and put him upon inquiry before embarking in

large expenditures, it seems only rashness, or rash specu-
lation. In fact, however, the returns bored the wells after
the first.

I have said so much only in consideration of the pecu-
niary magnitude of the case. and in deference to the elab-
oration, in the oral arguments and briefs of distinguished
counsel, of the points involved in the case, which do not
seem to me to be very difficult of solution, up to this point.
As stated above, the charge against Jones is to be by rents
and profits, not by annual rentals; but this presents a ques-
tion which has given me great perplexity, and this is the
question, what shall be credited to Jones against rents and
profits?—especially whether he shall be repaid expense of
boring wells.  Where one man, in possession under a hos-
tile defective claim or title, makes permanent improve-
ments, the common-law gave him no pay for them, as he
voluntarily put them upon the land of another; but our
Code (chapter 91) gives compensation therefor if, when
the improvements are made, there is "reason to believe
the title good under which he or they were holding." As
shown above, warning was given Jones by Tennant, his
agent, and by the record under which he purchased, of the
rights of the plaintiffs, and our Court has held that this
notice precludes allowance for improvements. *Hall* v.
*Hall*, 30 W. Va. 779 (5 S. E. 260); *Dawson* v. *Grow*, 29
W. Va. 333 (1 S. E. 564); *Cain* v. *Cox*, 29 W. Va. 258 (1 S.
E. 298); *Id.*, 23 W. Va. 613.  Good faith would seem to
be the test, but these cases affect Jones, legally speaking,
with a notice repelling good faith; and yet there is good
ground for saying that, as a matter of fact, Jones, from
misadvice as to the law, thought he was buying a good ti-
tle.  People generally think that a court sale always gives
good title, whereas often it does not.  Therefore, viewing
Jones as an adverse claimant, or as one who, being really
a tenant in common, yet takes sole possession, denying
the claim of all others and claiming the entirety, and tak-
ing exclusively all rents and profits, it is difficult to accord
him compensation consistently with dry law.  Even where
one joint tenant or tenant in common, not claiming the
whole,—not denying his fellow's right,—makes permanent
improvements, without his fellow's consent, he cannot
charge him, nor hold exclusive possession until reimbursed

by rents and profits. *Ward* v. *Ward's Heirs*, 40 W. Va. 611 (21 S. E. 746); Freem. Co-Ten. § 262. In *Great* v. *Jack*, 3 Watts. 238 (27 Am. Dec. 353), and note, it was held that "a joint tenant or tenant in common may not erect buildings or make improvements without the consent of his co-tenants, and then claim to hold until reimbursed a proportion of the moneys expended. Nor will it alter the case that the co-tenant knew that the buildings were being erected, and made no objection." The opinion there says: "There are, however, cases in which an owner standing by, and permitting another to expend money in improving, has, in equity, been deemed a delinquent, and been compelled to surrender his right on receiving compensation, or else to pay for the improvement; but in these cases there is always some ingredient which would make it a fraud in the owner of the land to insist on his legal right. There is something like encouragement to the other's going on; or the one party acts ignorantly, and without the means of better information, and the other remains silent when it is in his power to prevent him from expending his money under a delusion. To permit such a one to take advantage of the mistake would be revolting to every sentiment of justice. But, on the other hand, I know no case where equity has, on the mere ground of silence, relieved one who is perfectly acquainted with his rights, or has the means of becoming so, and yet willfully undertakes to proceed in expending money on the land of another without obtaining or asking his consent. His ignorance, if it exists, is willful, and he acts at his peril. In the case before us, there is no evidence that the plaintiff, in any respect, encouraged or connived at the erection of these buildings. . Nor was the plaintiff bound to notify Blair of his right in the land, or of his dissent to the erection of the buildings. Blair was well acquainted with the title of the respective parties, and if he was not he was bound to inquire into the title before he undertook to appropriate the lot. It was a matter of record, accessible to all."

It is difficult to ignore the force of that argumentation in this case. In fact, if we turn to the case of *Foster* v. *Weaver*, 118 Pa. St. 42 (12 Atl. 313), and the principles stated in it, we could, with some plausibility, deny any

cost of production at all. That case held that one tenant in common, tortiously deprived by fraud of his co-tenant of his interest in an oil lease, is entitled, in a suit brought for his share of the oil produced and converted by the co-tenant, to recover as damages the value of the oil in the tank without deducting for expenses of production. The test there made as to such allowance is whether the party acted under honest mistake of good right, or otherwise; and seeing that our cases of *Hall* v. *Hall*, 30 W. Va. 779, (5 S. E. 260), and *Dawson* v. *Grow*, 29 W. Va. 333, (1 S. E. 564), upon the record of the case in which Jones purchased, and other circumstances, would affect him with notice and deny him improvements, I repeat that there would be plausibility for denying any cost of production. The thought occurred to me that the record charged Jones with only constructive notice, not actual notice, and perhaps actual notice was necessary; but *Hall* v. *Hall*, *Dawson* v. *Grow*, and *Cain* v. *Cox*, 29 W. Va. 258, (1 S. E. 298), and *Id.*, 23 W. Va. 613, reject this thought; also 10 Am. & Eng. Enc. Law, 247. *Effinger* v. *Hall*, 81 Va. 94, holds constructive notice tantamount to actual notice, but holds that purchasers at judicial sales may well presume everything rightly done, but that purchasers *in pais* must examine the chain of title. This exception as to judicial sales, I doubt, our case of *Hall* v. *Hall*, 30 W. Va. 779, (5 S. E. 260), is *contra*. The very record of the case in which the sale was made and Hickman's will spoke the rights of plaintiffs. If a man's deed tells him of another's right, why may we not say so when the record giving him title tells him of it? To say otherwise is to say a purchaser at a court sale may shut his eyes to the contents of the record, which would notify him of another's right, make improvements, and then take away that other's rights, though by the sale he derived no title to such other's rights; the suit thus operating to do indirectly what it does not do directly. If Jones, by mistake of law, was led to believe that the court sale conferred good title, that will not serve him. Opinion in *Hall* v. *Hall*, 30 W. Va. 785, (5 S. E. 260); *Harner* v. *Price*, 17 W. Va. 523; 10 Am. & Eng. Enc. Law, 248, note.

But there are other considerations. We are in a court

of equity, which often departs from dry legal rules in the interest of substantial, even-handed justice. It does not seem that there is any inflexible, iron-clad rule in equity in this matter, unless our statute imposes it. This is not the case of a suit to impose upon the co-owner a personal liability, or a liability on his land, for improvements, nor to continue in possession till future profits shall reimburse them; but it is a case where the plaintiffs ask an account to charge Jones with rents and profits, and he seeks to set off improvements. Yea, more, it is a case where the plaintiffs ask to receive the benefit of the property in its improved condition,—to have the benefit of those improvements; that is, they ask pay for oil flowing through these very wells, without which wells there would not be a gallon of oil for them or for Jones. The law is well settled that in account of rents and profits you must charge the party for the property in its condition before his improvements, and not with the profits of his improvements (page 789, 30 W. Va., and page 265, 5 S. E.); Freem. Co-Ten. § 262; Code, c. 91, § 2; *Moore* v. *Ligon*, 30 W. Va. 155, (3 S. E. 576); *White* v. *Stuart*, 76 Va. 566; *Early* v. *Friend*, 16 Grat. 21; *Fishack* v. *Ball*, 34 W. Va. 644, (12 S. E. 856). This is a strong factor in the solution of this question. The plaintiffs demand their oil, solely the fruit of the pluck and courage and energy of Jones, in hazardous enterprises, which might have involved him in ruin. They come into a court of equity, asking that we accord them their legal rights, and they are given unto them, but it is an adage that he who asks equity must himself do equity. He cannot, in every instance, eat the fruitage without sharing in the burden of the planting. I repeat that no immovable rule binds a court of equity in this matter. Freeman's Co-Tenancy & Partition (section 279) says: "Improvements made by one co-tenant, independent of any agreement so to do, may sometimes be proper matter to be considered in taking an account; but under what circumstances, and to what extent, improvements may be considered in taking an account between co-tenants, cannot be stated with desirable precision. It is probable, however, that they will not be made a subject of compensation, unless they are of a usual character and necessary for the ordinary and conceded use

of the property." There is a difference between the case where the party making improvements seeks, as an actor or plaintiff, to set up a debt against the co-owner or his land for improvements, and one where the co-owner calls on the other to account for rents and profits; for in the former case, generally, the party will fail, and in the latter, if the party has acted in good faith, he will be allowed to set off improvements. See opinion in *Effinger* v. *Hall*, 81 Va. 103; 3 Pom. Eq. Jur. § 1241. There is some authority that where one has in good faith put improvements on land he may, by a suit of his own, charge the land. *Bright* v. *Boyd*, 1 Story, 478 (Fed. Cas. No. 1,875). But unless there was an agreement or circumstances tantamount, or fraud, I would doubt this. Clearly, a consent to such improvement binds the party, and creates a lien on the land and a personal obligation. *Houston* v. *McCluney*, 8 W. Va. 135. (It is proper to remark that defendants claiming improvements under chapter 91, Code, may recover beyond rents and profits, if in good faith claimants). I repeat that this suit is to charge Jones with rents and profits, and it is not inconsistent to allow him as a set-off expenses of production, including, not merely handling the oil, but the cost of boring productive wells, under the particular circumstances of the case, namely, that by reason of the energy and risk of Jones he developed this hitherto worthless land into an oil field of almost amazing wealth, yielding far beyond the cost of development, and leaving to go to the plaintiffs large returns. If we give Jones his expenditures, still a large amount goes to the plaintiffs; otherwise Jones loses them, and this would violate a rule of equity which, translated from the Latin, says that "by the natural law it is not right that any one should grow rich by the detriment and injury of another." Much authority can be shown to support this doctrine in addition to that given above. Story, Eq. Jur. § 1236, note; *Corcoran* v. *Corcoran* (Ind. Sup.) 21 N. E. 468; *Stewart* v. *Stewart*, (Wis.) 63 N. W. 886; 11 Am. & Eng. Enc. Law, 1107. But for Jones' acts, this oil would not have been produced, so far as we can see; but for him perhaps this oil now enriching the plaintiffs would have been lost to them by being drained off by wells on adjoining lands. Under these circumstances, equity cannot be blind to the

argument that Jones' acts have been to the plaintiffs a blessing, not even in disguise, but plain and apparent. We can not be deaf to the argument that the labor, enterprise, and business ability of this man, though technically in the wrong, appeal to a court of equity with strong call for liberality so far as to repay him by set-off all outlay in producing oil, including cost of productive wells, and we resolve any doubt by so holding. A debt for such improvement could not be made against the plaintiffs, nor would we say that all their oil could be thus absorbed; but here is a large surplus.

In conclusion, I must not omit to say that our holding in allowing cost of wells is fortified by the precedent of *Ruffners* v. *Lewis' Ex'rs*, 7 Leigh 720, where parties, holding adversely to the plaintiff, were treated as tenants in common with them, and as they had bored wells, and discovered and produced salt water, were allowed improvements, including cost of wells, as set-offs against rents and profits, and even for abortive wells, the court saying: "The plaintiffs, if they will have advantage from their successes, must be content to share in their disappointments and failures. He who takes the profit must share the burden." True, in that case, the court found that the parties acted under fair belief of good title, so that their good faith could not be doubted. Here, under cases above cited, we can not find that Jones is unaffected by notice of the plaintiffs' right; but for which I should not, for a moment, entertain any hesitancy in allowing him cost of wells. I have above treated the wells as if permanent improvements. Perhaps they are not to be so treated, but rather as a part of the cost of production, like a tank for keeping the oil when produced. An allowable improvement must be that which adds to—enhances the value of—the land permanently for general uses; but a well or derrick adds nothing permanently, at least for general use, and usable only for producing oil—the mere means or instrument of production. If this be so, there is less question about allowing their cost as but an item in the cost of production, though I have discussed the subject under the law relating to improvements. Treating cost of productive wells as cost of production of oil, we may say that, though Jones had notice of plaintiffs' right, yet he should be charged with net rents

and profits, not gross—with what he actually received,—otherwise equity inflicts a penalty. As an abortive well neither enhances the value, nor yields anything to the true owner, he ought not to be charged with its costs. I confess that, under our statute and decisions, I have hesitancy in this holding; but other members of the Court do not, and feeling that Jones, under the circumstances, has strong claims to such allowance, I concur with other mem- in so holding. But the law ought to be clearly and accurately understood in so important a matter, and I want to state for myself what I understand to be the law, under our statute and decisions. An ejected defendant, who made permanent improvements valuable to the estate, not when he merely believed his title good, but when there was reason to believe it good, may by filing his claims under section 32, chapter 90, and section 1, chapter 91, Code 1891, not only set off the value of such improvements against rents and profits, but recover any balance by which their value may exceed rents and profits; but if, when the improvements were made, there was not reason to believe the title good, he cannot even set them off against rents and profits; and notice either actual or constructive, of the defect of the improver's title and of the rights of others will preclude allowance for such improvements. He is precluded because he acts in bad faith or negligence, and cannot take away even the rents and profits of another by improvements the latter did not sanction, which by the common-law became part of the land and belonged to the true owner, no matter how they came there, and which the statue allowed only to one legally without blame. The wrongdoer is not given the benefit of his wrong.

*Reversed and Remanded.*