C. E. LAWHEAD, *Receiver, etc. v.* LUTHER LAZZELLE

(CC 479)

Submitted May 3, 1933. Decided May 16, 1933.

(Rehearing denied August 1, 1933)

*George R. Farmer,* for plaintiff.
*Lazzelle & Lazzelle* and *C. A. Goodwin,* for defendant.

KENNA, JUDGE:

C. E. Lawhead, as receiver designated by the banking commissioner for Union Bank & Trust Company, exhibited a bill of complaint in the circuit court of Monongalia County against Luther Lazzelle, in which it was alleged that the bank on September 4, 1931, was found by the banking commissioner to be insolvent and plaintiff named on that day as its receiver

and that on that day he qualified; that on the same day, the banking commissioner laid the full constitutional and statutory assessment of 100% of the par value of their stock on the stockholders of the Union Bank & Trust Company and directed his receiver to collect it; that on September 4, 1931, the entire outstanding capital stock of said bank was 1450 shares of a par value of $100.00 per share; that on that day, the defendant, Luther Lazzelle, owned fifteen shares of said stock acquired by him on and prior to September 4, 1921, and owned by him from that date until September 4, 1931; that on the date of said assessment being laid the bank was insolvent and was indebted to its creditors upon liabilities accruing after the defendant became the owner of the stock in a sum of money greatly in excess of the full par value of its outstanding capital stock; that the requirements concerning notice, demand, etc., of the amount of the said assessment have been complied with and that the defendant has failed and refused to pay it. The exhibits showing the steps by which the formalities leading up to the filing of the bill of complaint were complied with are filed with the bill. The sufficiency of the bill and its exhibits is not challenged.

The defendant, Luther Lazzelle, appeared and filed an answer in which he challenges the right of the banking commissioner to lay the assessment against his stock in the Union Bank & Trust Company and relies upon the following circumstances to sustain that position: That on the 2nd day of August, 1930, with the approval of the banking commissioner, the Union Bank & Trust Company assigned and transferred all of its real estate, personal property and assets of every kind and character to the Bank of Monongahela Valley; that the Bank of Monongahela Valley took over all of the assets of the Union Bank & Trust Company and that the latter bank thereby became merged and consolidated with the former. Thereupon, the Union Bank & Trust Company ceased to do business, surrendered its certificate of authority and passed out of existence as a bank and trust company; that owing to the said assignment and transfer respondent from and after August 2, 1930. ceased to be a stockholder of the selling bank and that any contingent liability to pay the assessment imposed by law upon the stockholders of banks found to be insolvent was

thereby wholly extinguished; that the selling bank had not
before the assignment been found to be insolvent by any
competent authority; that its existence as a banking institution
ceased on the date of the assignment, and that consequently
the subsequent declaration of insolvency by the banking com-
missioner is wholly illegal; that at the date of the assignment,
the selling bank was entirely solvent; that the Bank of Monon-
gahela Valley, on December 30, 1930, when it was closed by
L. R. Charter, Jr., the banking commissioner, and declared
to be insolvent, had entirely taken over the affairs of the
Union Bank & Trust Company which had ceased to control its
own affairs after the date of the assignment; that on December
22nd and long prior thereto, the said Bank of Monongahela
Valley was hopelessly insolvent; that after December 22, 1930,
the affairs of the Bank of Monongahela Valley were entirely
in the hands of the banking commissioner; that the assign-
ment of August 2, 1930, was consented to and acquiesced in
by all the depositors and creditors of Union Bank & Trust
Company and was ratified and confirmed by them, as well as
by the stockholders of the selling and purchasing banks; that
the depositors of Union Bank & Trust Company drew their
checks on their respective accounts in that bank and deposited
them to their credit in the Bank of Monongahela Valley; that
such acquiescence and ratification on the part of the creditors
and depositors of the selling bank amounted to a novation, the
effect of which is to estop the depositors and creditors of
Union Bank & Trust Company from pleading lack of notice
or knowledge of the contract of August 2, 1930; that on De-
cember 31, 1930, plaintiff receiver had in his charge and under
his control all of the records and property of the Bank of
Monongahela Valley as well as of the Union Bank & Trust
Company; that on September 4, 1931, when the Union Bank
& Trust Company was declared to be insolvent by the banking
commissioner, it had gone out of business by virtue of the
contract of August 2, 1930, and that all of the conduct and
proceedings of the banking commissioner therefore are in-
valid as to it and as to its stockholders; that plaintiff had no
duties to perform as to the Union Bank & Trust Company;
that the defendant had ceased to be a stockholder on August
2, 1930, when the sale and transfer of the assets of Union Bank

& Trust Company took place, and that the conduct of the banking commissioner, as it affects the Union Bank & Trust Company and its stockholders, is in all respects void and without legal force and effect.

This answer sets up as an exhibit the contract in writing of August 2, 1930, between Union Bank & Trust Company, selling bank, and Bank of Monongahela Valley, purchasing bank.

The banking commissioner, through his receiver, filed his demurrer to this answer, pointing out the reasons for his assertion that it does not constitute a defense to his bill of complaint. The court below sustained the demurrer to the answer, and, upon joint application of the parties, certified to this court the questions arising thereon.

The salient features of the contract of August 2, 1930, filed as an exhibit with the answer, are (1) that Union Bank & Trust Company, the selling bank, transfers its cash on hand, United States Bonds, clearances, balances due from banks and overdrafts, in the aggregate of $59,718.71, to the Bank of Monongahela Valley, the purchasing bank; (2) that the purchasing bank undertakes to pay all of the liabilities, including deposits, of the selling bank amounting to $1,016,291.52; (3) that the aggregate in dollars of the assets transferred is subtracted from the aggregate of the liabilities and found insufficient to meet the liabilities by the sum of $956,572.81, the selling bank agreeing to make its collateral note in that amount to the buying bank; and (4) that the selling bank does "file and pledge with said note as collateral to secure the payment of said note or any renewal or renewals thereof, all of its remaining assets of every kind and character, including all bills receivable, with any security attached", the purchasing bank to collect the collateral, with the assistance of a committee of five of the officers and directors of the selling bank named by the selling bank, apply the amount collected to the collateral note, and if there is more collected than is necessary to retire it, pay the balance to a committee of selling bank to be in turn paid to the stockholders of the selling bank, pro rata. In addition to pledging its receivables, the selling bank pledges all of its banking house, its real estate, and its remaining quick assets consisting of certain bonds, the whole pledged

amounting to $1,225,241.17. All of the assets transferred by the selling bank to the buying bank "either outright or for such collateral purpose, are sold, assigned and transferred *with full recourse* upon the said Union Bank & Trust Company". The contract provides that should there be a balance of the collateral note remaining unpaid after all of the assets to secure it have been disposed of and applied, that such balance shall "be and remain an obligation of the party of the first part and shall entitle the party of the second part to proceed by proper procedure to enforce *all legal liabilities* therefor". The contract further provides "the Union Bank & Trust Company agrees to discontinue business as a banking institution from the date hereof and that it will use due diligence in liquidating its affairs and *take all necessary steps to maintain its corporate existence* and keep full and complete corporate minutes and records during the existence of the collateral note or any renewals thereof, but that it will immediately after the satisfaction hereof take proper necessary steps to surrender its charter."

The contention of the defendant is that, on the basis of this contract and the events which took place between the time of its execution and the time when the Union Bank & Trust Company was declared by the banking commissioner to be insolvent, as set up in the answer, his contingent liability as a stockholder to pay the double assessment prescribed by law is barred, first, because the outright, unconditional sale while the banks were solvent extinguished the conditional liability; second, because the acquiescence of the stockholders and creditors of the selling bank in the assumption by the buying bank of all indebtedness estopped them from asserting the double liability and if they cannot assert it, the receiver for the bank cannot assert it for them; third, because the fact of solvency and of novation pleaded in the answer are issuable facts and cannot be met by a demurrer.

The existence of the selling bank was to continue under the terms of the contract. A part only of its assets was transferred to the buying bank. Out of a total of $1,284,959.88 in assets only $59,718.71 of value was transferred outright to the purchasing bank. The remaining assets were pledged to secure a collateral note in the sum of $956,572.81. The pur-

chasing bank assumed and agreed to pay an indebtedness amounting to $1,016,291.52.

As against deposits of all kinds amounting to $887,986.44, the selling bank had on hand in cash, currency, balances due from banks and overdrafts, together with certain United States Bonds, a total of but $59,718.71, so that if not actually insolvent at the date of transfer, it, without doubt, had a badly depleted reserve. According to the figures given in the contract, the required minimum reserve exceeded $70,000.00. These were the circumstances when it entered into the contract of August 2, 1930.

It is urged that because the banking commissioner approved the contract of transfer and because the statute gives him the right to approve only outright sales and unconditional transfers, the contract in question must be regarded as within the statute and therefore unconditional and an outright sale. We cannot follow this reasoning. It would be more logical, it seems to us, to say that, in approving a contract of this sort, if indeed it is not such a contract as the statute contemplates, the banking commissioner exceeded his lawful authority and that his approval, therefore, in such case would be held for naught. We are told further that the commissioner's approval established the solvency of the bank for the reason that only solvent banks are permitted to make transfers of this nature under the statute. The same reasoning applies here. Mindful as we are of the fact that the commissioner's declaration of insolvency cannot be challenged (*Tabler* v. *Higginbotham,* 110 W. Va. 9, 156 S. E. 751), we, nevertheless, believe that it would be dangerous doctrine to hold that his approval of a contract setting up figures, which, on their face, show a condition of solvency, unimpeachably establishes solvency as a fact. It is true that the answer alleges that at the date of the contract, the selling bank was solvent. According to some authority, this is merely alleging a conclusion. The answer does not allege that the figures of the contract which show solvency are based upon actual and true value as compared with the true state of the bank's liabilities. But this discussion of solvency is beside the point. If the banking commissioner had jurisdiction, his declaration of insolvency cannot be made the basis of an issue. We cannot hold that the contract of August

2, 1930, extinguished the contingent liability of the stockholders to pay the double liability assessment prescribed by law upon stockholders of insolvent banks. The contract was not an unconditional transfer. Neither does the approval of the banking commissioner of that contract establish solvency. The statute does not contemplate that it should in the light of its express terms: " * * * and the *rights of creditors* and all liens upon the property of either of said participating corporations *shall be preserved unimpaired* * * *." Acts 1929, C. 23, Sec. 31. To say that a contract made under this statute necessarily extinguishes the contingent liability of stockholders to respond to the double assessment imposed by law on the stockholders of insolvent banks, would be to deprive creditors of the final bulwark intended to establish banking credit on a firm basis, and, furthermore, would defeat the obvious purpose of the statute itself, which is to facilitate, and not to impede, negotiations making for the stability of the whole banking structure of the state. This purpose would obviously, be impaired, if, in negotiations of this sort, the very "backlog" of the creditors' recourse could be jeopardized. It is plain from the very terms of this contract that it did not contemplate such a result.

Neither can we agree with the contention of the defendants that the contract and events subsequent to its execution represented a novation on the part of all of the creditors and on the part of all the depositors of the selling bank. We recognize the general principle that novation may be shown from facts and circumstances and that estoppel to deny a novation may, by the conduct of one or more of the parties, with full knowledge, take the place of direct and unequivocal agreement as to that party. *Gillett* v. *Ivory et al.*, 173 Mich. 444, 139 N. W. 53. We do not believe, however, that the answer in this case sets up facts and circumstances that would justify us in holding that such an estoppel is averred. It seems to us that an estoppel of this nature cannot be pleaded *en masse* against an unorganized class of persons. It would depend upon the facts and circumstances as acted upon by each individual depositor and each individual creditor. Neither are the circumstances pleaded here sufficient to show an implied novation on the part of creditors.

For the purposes of a pleading, such as the answer here, it would have to be complete in the sense that it would have to be effective as to all of the depositors and as to all of the creditors. It cannot be said that these stockholders of the selling bank, who obviously sought and formally approved a change in status to them, brought about by the agreement of August 2, 1930, can claim prejudice because of the lapse of time and the impossibility to be restored to the *status quo*. It would be more reasonable to infer that time to work out the affairs of their bank was what they were striving for and is what they got for their own benefit. It is not alleged that any of the creditors or depositors induced the entering into of the contract of August 2, 1930. They had nothing to do with the abandonment of the *status quo anti* of that agreement. Why then should they be under any obligation if it is impossible for it to be restored? The mere fact that time has gone by since the basis of the alleged novation was established and that neither the creditors nor the depositors have taken legal action to nullify the contract is not sufficient to establish the fact of novation, which is based upon either an express or implied contractual relationship or upon an estoppel with full knowledge, which is the equivalent. *Williamson* v. *Jones,* 43 W. Va. 562, 27 S. E. 411, 38 L. R. A. 694, 64 Am. St. Rep. 891; *Haynes* v. *Delius et al.* (Tenn.), 59 S. W. 158. While it is perfectly true that facts alleged in an answer must usually be met by some form of replication, either general or special, making a factual issue to be submitted and decided, this is not so where the allegations of facts contained in the answer are not sufficient to make a legal defense. We hold this answer insufficient on that basis.

The receiver here, in taking over the affairs of Monongahela Valley Bank necessarily took over such of the affairs of Union Bank & Trust Company as had been turned over to the former. The latter bank was still obligated on the collateral note. It still held the legal title to the bulk of its assets. It still continued its corporate existence, assisting, through its committee, in its own liquidation. That liquidation was suspended by the receivership of Monongahela Valley Bank. Under these circumstances, the banking commissioner would have been recreant had he taken no cognizance of the affairs of Union

Bank & Trust Company. Having taken cognizance of those affairs, he appears to have acted with correctness and vigor.

The answer in this matter is rather voluminous; it raises many issues and attempts to depend upon much intricacy of allegation. We have not attempted to deal with all of the phases of it. Simply, we have endeavored to meet and to discuss and to decide the substantial defenses woven into it. We do not deem it sufficient to constitute a defense to the plaintiff's bill of complaint. For this reason, the question certified to us, namely, the sufficiency on demurrer of the answer in question, is resolved in favor of sustaining the demurrer and affirmance will be certified to the trial court.

An observation may not be out of place for the purpose of pointing out the distinction between this case and the case of *Lawhead, Receiver, etc., v. Adams et al.,* 169 S. E. 330 in which Judge Maxwell wrote a characteristically lucid opinion. In the Adams case, a contract of sale to the Huntington Clearing House Association had been entered into. The selling bank made its note to the purchaser for $100,000.00. However, the banking commissioner had, previous to the entering into the contract, laid the double liability assessment against the stockholders of the selling bank. After this was done, the purchaser assumed all of the liabilities of the selling bank, and, furthermore, provided in the contract for the discount of its (purchaser's) note by the Twentieth Street Bank making provision for enough actual cash to retire all of the liabilities. A liquidating agent was actually proceeding under the contract satisfactorily to liquidate the affairs of the selling bank. Then the banking commissioner, through a subsequently appointed receiver, undertook to enforce double liability of stockholders after all of the assets of the bank had been disposed of and while another agency, under a contractual obligation so to do, was paying off the liabilities of the selling bank. We therefore held in the *Adams* case that the commissioner had lost the right to enforce the liability through his receiver. We did not hold that any of the circumstances in that case had operated to extinguish the liability.

The ruling of the lower court in sustaining the demurrer to defendant's answer must be affirmed.

*Affirmed.*